**Timothy S. DeJong**, OSB No. 940662
Email: tdejong@stollberne.com
**Emily Johnson, OSB No. 183791**
Email: ejohnson@stollberne.com
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. Oak Street, Suite 500
Portland, OR 97204
Telephone:     (503) 227-1600
Facsimile:      (503) 227-6840

**Steven A. Schwartz** (*pro hac vice* application forthcoming)
Email: steveschwartz@chimicles.com
**Garrett Wotkyns** (*pro hac vice* application forthcoming)
Email: gww@chimicles.com
CHIMICLES SCHWARTZ KRINER & DONALDSON-SMITH
One Haverford Center
361 West Lancaster Avenue
Haverford, PA 19041
Telephone:     (610) 642-8500
Facsimile:      (610) 649-3633

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| JAYSON EAST AND DAVID SMITH, individually and as representatives of a class of similarly situated persons and on behalf of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS DISTRICT #9 PENSION PLAN,<br><br>Plaintiffs,<br><br>v.<br><br>PRINCIPAL GLOBAL INVESTORS TRUST COMPANY, DELAWARE CHARTER GUARANTEE & TRUST COMPANY d/b/a PRINCIPAL TRUST COMPANY, PRINCIPAL GLOBAL INVESTORS, LLC, PRINCIPAL LIFE INSURANCE COMPANY, and PRINCIPAL MANAGEMENT CORPORATION.,<br><br>Defendants. | Case No. 3:26−cv−00738<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>**ERISA Prohibited Transactions and ERISA Breach of Fiduciary Duties**<br><br>(29 U.S.C. § 1132(a)(2)–(3); 29 U.S.C. § 1104(a)(1)(A)–(B), (D); 29 U.S.C. § 1106(a)(1); and 29 U.S.C. § 1109) |

## NATURE OF THE ACTION

1.      Plaintiffs Jayson East and David Smith ("Plaintiffs"), individually and as representatives of the Class described herein and on behalf of the International Brotherhood of Electrical Workers #9 Pension Plan ("IBEW" and "the Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Principal Global Investors Trust Company, Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company, Principal Management Corporation, Principal Life Insurance Company and Principal Global Investors, LLC (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and committed ERISA-prohibited transactions with respect to their disloyal and imprudent management of the Principal LifeTime Hybrid Collective Investment Trusts ("Principal TDFs") as well as with respect to Defendants' management of the Plan's administrative expenses, in violation of ERISA. Plaintiffs bring this action to recover the losses caused by Defendants' fiduciary breaches, disgorge the profits earned by Defendants and their affiliates as a result of these breaches, prevent further mismanagement of the Principal TDFs, and obtain equitable and other relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      This is an ERISA class action case against the Principal Financial Group, Inc. family of financial services companies, the corporate affiliates of which are the investment manager and recordkeeper (among numerous other roles the Principal companies play) for a large union-sponsored defined contribution retirement plan for electrical workers in the Pacific Northwest ("the Plan"). As set forth below, despite Defendants' legal status as ERISA fiduciary to Plaintiffs here, Defendants acted disloyally and imprudently with respect to Plaintiffs and the

PAGE 1 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

Plan and retirement plan investors nationwide invested in Principal's so-called "target date" collective trust retirement funds by extracting unreasonable fees from Plaintiffs and other retirement investors in violation of ERISA.

3.      Launched in 2009, the Principal TDFs are a series of target date funds maintained as collective investment trusts, which are pooled investment vehicles maintained by a bank or trust company available exclusively to retirement plan customers. A collective investment trust is managed and operated in accordance with that trust's governing documents.

4.      A target date fund is a diversified investment providing exposure to a variety of asset classes that is comprised mostly of equity and fixed income securities with an investment mix that becomes less risky as the fund's target (retirement) date approaches. Target date funds are generally offered as a suite of funds with target dates staggered 5 to 10 years apart, allowing the retirement plan participant to choose the target date that aligns with his or her estimated retirement date. The Principal TDFs included in the Plan consist of collective investment trust options with a target date ranging from 2015 to 2070 (2015, 2020, 2025, etc.), and an option called Principal LifeTime Hybrid Income CIT designed for investors "who have reached their investment time horizon."

5.      At all relevant times the Principal TDFs have been managed using a fund-of-funds structure, meaning that the TDFs' assets are invested in other pooled investment products, which, according to the Declaration of Trust for the TDFs, can be mutual funds, collective investment trusts and annuity separate accounts, among other options. During the relevant time period, the fees of each Principal TDF consisted of four components: (a) a trustee fee of .03%, which is set by the Declaration of Trust for the TDFs; (b) operating expenses, which are deducted from the trust; (c) a service fee, which varies based upon the share class selected in the participation

PAGE 2 – CLASS ACTION ALLEGATION COMPLAINT

agreement relating to these funds, which ranges from 0 bps to 29 bps; and (d) the fees charged by the underlying investments in the instant Principal TDF. The first, second, and fourth fee components were the same for all investors in a particular Principal TDF, while the service fee varied depending upon the share class selected by the participating retirement plan.

6.      Because Principal TDF investors like Plaintiffs bear the expense of the underlying investment options, Defendants' decisions regarding which underlying investment options to use as the so-called underlying funds here directly determined the amount of fees paid by Principal TDF investors like Plaintiffs.

7.      Defendants in this case include the trustee of the Principal TDFs, the recordkeeper for the Plan and the investment adviser of the Principal TDFs. Under the Declaration of Trust, the trustee and investment adviser were jointly responsible for determining the asset allocation of the Principal TDFs as well as selecting the specific funds used to achieve each Principal TDF's target asset allocation. As Defendants have acknowledged in both the Declaration of Trust and sales literature for the Principal TDFs, they were all fiduciaries with respect to the management of the Principal TDFs, and their fiduciary duties included the selection and monitoring of investment options and investment managers.[1]  They are also "parties in interest" under ERISA's prohibited transaction rules and thus categorically prohibited under those rules from collecting "more than reasonable compensation" in fees from Plaintiffs relating to the TDFs as set forth below.

---

[1]  Principal LifeTime Hybrid TDFs brochure at 5 (June 2024), available at https://secure02.principal.com/publicvsupply/GetFile?fm=PQ8820&ty=VOP&EXT=.VOP (hereinafter "2024 Brochure").

PAGE 3 – CLASS ACTION ALLEGATION COMPLAINT

8.      The Principal TDFs' investment process is described in their sales literature.[2] First, Defendants determined which asset classes would make up the TDFs. Second, Defendants determined the percentage allocations to each of these asset classes throughout the investor's investment lifespan. This gradually shifting asset allocation is known as the "glide path" for a series of target date funds. Third, Defendants constructed each Principal TDF's investment portfolio, which involved "the selection and monitoring of the Target Date Funds' underlying investment options and investment managers."[3] Defendants' ERISA-prohibited transactions as to the TDFs in this case relate entirely to this third step—the selection and monitoring of the Principal TDFs' underlying investment options and the fee compensation that the Principal family of companies received in exchange for selecting and monitoring these underlying funds.

9.      As part of this third step, Defendants determined that four asset classes should be represented through passively-managed investment portfolios, commonly known as "index funds": (1) large company domestic equities ("large cap stocks") would be represented by an index fund tracking the Standard & Poor's 500 Index ("S&P 500 Index"); (2) fixed income securities ("bonds") would be represented by an index fund tracking the Bloomberg Barclays Aggregate Bond Index; (3) midsize company domestic equities ("mid cap stocks") would be represented by an index fund tracking the S&P MidCap 400; and (4) small company domestic equities ("small cap stocks") would be represented by an index fund tracking the S&P SmallCap 600 Index. Throughout the relevant period, Defendants have used index funds

---

[2] *See, e.g.*, 2024 Brochure at 6; Principal Trust[SM] Target Date Collective Investment Funds brochure at 2-5 (May 2014), available at https://www.principal.com/allweb/docs/ris/investments/profile/1/pj_1052.pdf (hereinafter "2014 Brochure").

[3] 2014 Brochure at 4.

PAGE 4 – CLASS ACTION ALLEGATION COMPLAINT

tracking these specific indices to provide exposure to these four asset classes, and these four index funds have represented 60 to 70 percent of the total assets of each of the Principal TDFs.

10.     Plaintiffs do not challenge either the decision to use passive investments for these four asset classes or the index used to represent each asset class. Defendants' ERISA breaches as to the TDFs relate to *which* index funds Defendants utilized to track each of these four indices and Defendants' fee compensation relating to the TDFs.

11.     The marketplace for both target date funds and index funds is highly competitive. For most major market indices, one or more investment management companies offer an index fund product that can track the index with a high degree of accuracy while charging very low fees. This is particularly true for large investors such as the Principal TDFs (which at all relevant times had over two billion dollars invested in index fund investments), which can leverage their billions in investable assets to negotiate lower fees than are available to the vast majority of investors.

12.     Defendants did not invest in any of the competitive index fund offerings in the marketplace in constructing the asset base of the Principal TDFs, choosing instead to profit themselves and their affiliates by investing almost exclusively in Principal's proprietary index funds as the TDFs' underlying funds despite the Principal index funds having fees that were higher than marketplace alternatives that tracked the *exact same index*. Not only were the Principal index fund products at issue here far more expensive than available non-Principal index fund products, but they were also of significantly lower quality. Compared to marketplace alternatives, Principal's index funds deviated further from the benchmark index and consistently had the worst performance even on a pre-fee basis as set forth below.

PAGE 5 – CLASS ACTION ALLEGATION COMPLAINT

13.     Given the high fees and history of poor performance of Principal's index funds, a prudent and unconflicted ERISA fiduciary of a multi-billion dollar suite of target date funds acting in the best interest of the trust beneficiaries would have removed these proprietary index funds from the Principal TDFs at the beginning of the relevant period and replaced them with more competitive marketplace alternatives. Defendants' failure to do so cost Plaintiffs and other TDF investors millions in investment losses compared to what they would have earned had Defendants acted in accordance with their ERISA duties while earning Defendants many millions in fees.

14.     Defendants' failure to exercise the level of prudence and loyalty expected under the circumstances is best illustrated by contrasting their conduct to that of other, similarly situated ERISA fiduciaries who managed target date collective trust funds for retirement plans during the same time frame. Fiduciaries of numerous other target-date collective investment trusts invested during the relevant time period in non-proprietary index funds as the underlying holdings in their target date fund series despite the fact that each of these financial services companies also offers their own proprietary indexing products or services in the marketplace. In fact, no major target date managers aside from Principal itself used Principal's index funds as underlying holdings in their target date funds during the relevant period.

15.     Defendants' failure to manage prudently and loyally the underlying investments of the Principal TDFs was not limited to index fund selection. Defendants also intentionally selected higher-fee versions of proprietary actively managed funds to increase Defendants' fee revenue at the expense of trust participants and beneficiaries like Plaintiffs and the proposed classes here. Under the Declaration of Trust, Defendants were permitted to invest in collective investment trusts, mutual funds, annuity separate accounts and other vehicles in assembling the

PAGE 6 – CLASS ACTION ALLEGATION COMPLAINT

underlying funds for the TDFs. For many of the Principal-affiliated investments selected by Defendants, Principal offered both mutual fund and annuity separate account versions. Each of these vehicles contained identical investments but varied significantly in terms of costs. Principal also offered different share classes of each of these different vehicle, with the primary difference being the costs associated with each share class.

16.     Investment in the lowest-cost share class generally requires the investor to meet a minimum investment requirement. These minimums were easily met in this case. While many investors might have been constrained as to which vehicle or share class they could own due to contractual limitations, regulatory constraints or a limited asset base, Defendants did not face any of these constraints in managing the Principal TDFs given the asset base of the Principal TDFs, the resulting negotiating power and the language within the Declaration of Trust pertaining to the TDFs permitting ownership of various investment products.

17.     As a fiduciary, Defendants "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) (en banc). Yet Defendants did exactly that by intentionally selecting more expensive vehicles and share classes of underlying funds managed by Principal, not because of any benefit they conferred upon participants, but because of the additional fees Defendants and their affiliates received from these more expensive options.

18.     These imprudent investment decisions were not the result of mere negligence or oversight. To the contrary, Defendants consistently invested the assets of the Principal TDFs in costly and underperforming Principal-branded funds and failed to timely remove those funds long after a reasonable investigation would have revealed the availability of lower cost, better

PAGE 7 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

performing options. Defendants' wrongdoing consistently earned Defendants and their Principal corporate affiliates additional investment management fees and provided a larger asset base to make Principal's index fund and mutual fund products more competitive in the retirement investment marketplace.

19.     By managing the Principal TDFs in this fashion, Defendants have committed ERISA-prohibited transactions, in violation of 29 U.S.C. § 1104, since Defendants here were ERISA "parties in interest" that obtained more than reasonable fee compensation under the circumstances alleged here in connection with their management of the TDFs. This is true with respect to retirement investors in the Principal collective trust TDFs nationwide, and Plaintiffs therefore seek relief here on behalf of a proposed nationwide class of all ERISA-covered retirement plan investors who these products.

20.     In its role as recordkeeper to the Plan here, Defendant Principal Life Insurance Company ("Principal Life") also engaged in a different type of fee-gouging specific to the Plan and IBEW union member electrical workers invested in it. As set forth below, Principal Life padded its recordkeeping fee revenues as to the Plan and its participants, such as Plaintiffs, in much the same conceptual manner as Defendants have padded their fee revenues relating to the TDFs—viz, through self-dealing and extraction of more compensation from Plaintiffs and the Plan than is reasonable and warranted under present retirement investing market conditions.

## JURISDICTION AND VENUE

21.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provides a private right of action to retirement plan participants to remedy breaches of fiduciary duties and ERISA-prohibited transactions and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. § 1109.

PAGE 8 – CLASS ACTION ALLEGATION COMPLAINT

22.    This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1)(F).

23.    Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the breaches of fiduciary duties giving rise to this action occurred, this District is where the Plan is located and because at least one Defendant (PGI Trust, identified below) is incorporated in this District and the administrator for the Plan is headquartered in this District.

## THE PARTIES

### PLAINTIFFS

24.    Plaintiff David Smith ("Smith") resides in Vancouver, Washington, and is a current participant in the Plan. Through the Plan, Smith is invested in the Principal LifeTime Hybrid 2020 TDF. Had Defendants prudently and loyally managed the Principal TDFs consistent with ERISA, Smith would have more assets in his plan account, and therefore he has been injured by Defendants' unlawful conduct. Furthermore, Defendants have been unjustly enriched as a result of Smith's investment in the Principal TDFs.

25.    Plaintiff Jayson East ("East") resides in Halsey, Oregon and is a current participant in the Plan. Through his participation in the Plan, East is invested in the Principal LifeTime Hybrid 2030 TDF and the Principal LifeTime Hybrid 2040 TDF. Had Defendants not violated their ERISA duties in their management of the Principal TDFs, East would currently have more assets in his Plan account, and therefore he has been injured by Defendants' unlawful conduct. Furthermore, Defendants have been unjustly enriched as a result of East's investment in the Principal TDFs.

PAGE 9 – CLASS ACTION ALLEGATION COMPLAINT

## DEFENDANTS

### *PGI Trust*

26.    Defendant Principal Global Investors Trust ("PGI Trust") has been the trustee of the Principal TDFs since January 1, 2017. PGI Trust is an Oregon corporation but is located in Des Moines, Iowa. PGI Trust was at all relevant times a wholly owned subsidiary of Principal Financial Group, Inc.

27.    During the relevant period, PGI Trust had primary responsibility for managing the assets of the Principal TDFs, including the selection and monitoring of investment managers to manage the assets of the Principal TDFs. PGI Trust received direct and indirect compensation for rendering investment advice with respect to the management of the Principal TDFs.

28.    Because it is a fiduciary of each plan as to the assets invested in the Principal TDFs, PGI Trust qualifies as an "investment manager" as defined by 29 U.S.C. § 1002(38), and as such is a named fiduciary pursuant to 29 U.S.C. § 1102(c)(3). Further, PGI Trust is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it exercises discretionary authority and control with respect to the management or disposition of plan assets, and because it renders investment advice for a fee or other compensation with respect to plan assets.

### *Principal Trust*

29.    Defendant Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company ("Principal Trust") was the trustee of the Principal TDFs from their 2009 inception through the end of the 3rd quarter of 2025. Principal Trust is a Delaware corporation but at all relevant times was located in Des Moines, Iowa. Principal Trust was at all relevant times a wholly owned subsidiary of Principal Financial Group, Inc.

PAGE 10 – CLASS ACTION ALLEGATION COMPLAINT

30.    Under the Declaration of Trust, Principal Trust has primary responsibility for managing the assets of the Principal TDFs, including the selection and monitoring of investment managers. Past versions of the Declaration of Trust identified Principal Trust as the fiduciary of the Principal TDFs. Because it was identified in the Declaration of Trust and participation agreements as a fiduciary as to every plan with assets invested in the Principal TDFs, Principal Trust qualifies as an "investment manager" as defined by 29 U.S.C. § 1002(38) and is thus a named fiduciary for every participating plan pursuant to 29 U.S.C. § 1102(c)(3). Further, Principal Trust is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and control with respect to the management or disposition of plan assets, and because it rendered investment advice for a fee or other compensation with respect to plan assets.

## *PGI*

31.    Defendant Principal Global Investors, LLC ("PGI") is a registered investment adviser and has acted as the investment adviser of the Principal TDFs from approximately January 2017 to the present. PGI is a Delaware corporation, but at all relevant times was located in Des Moines, Iowa. PGI was at all relevant times a wholly owned subsidiary of Principal Financial Group, Inc.

32.    Pursuant to an agreement with PGI Trust, from approximately January 2017 to the present, PGI has served as investment adviser to the Principal TDFs, subject to the supervision and review of PGI Trust. In this capacity, PGI shared responsibility with PGI Trust for the asset allocation of each Principal TDF and the selection and monitoring of the individual investments held by each Principal TDF.  Because it was identified in the Declaration of Trust and participation agreements as a fiduciary as to every plan with assets invested in the Principal

PAGE 11 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

TDFs, and acknowledged its fiduciary role in its agreement with PGI Trust, PGI qualifies as an "investment manager" under 29 U.S.C. § 1002(38), and is thus a named fiduciary for every plan with assets invested in the Principal TDFs pursuant to 29 U.S.C. § 1102(c)(3). Further, PGI is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority and control with respect to the management or disposition of plan assets, and because it rendered investment advice for a fee or other compensation with respect to plan assets.

### *PMC*

33.    Defendant Principal Management Corporation ("PMC") is a registered investment adviser and acted as the investment adviser of the Principal TDFs from their 2009 inception until approximately the end of 2024. PMC is an Iowa corporation located in Des Moines, Iowa. PMC was at all relevant times a subsidiary of Principal Financial Group, Inc.

34.    Pursuant to an agreement with Principal Trust, from 2009 to present, PMC served as investment adviser to the Principal TDFs, subject to the supervision and review of Principal Trust. In this capacity, PMC shared responsibility with Principal Trust for the asset allocation of each Principal TDF and the selection and monitoring of the individual investments held by each Principal TDF.  PMC received a fee for the services it performed for the Principal TDFs. PMC also served as the portfolio manager for the large majority of the underlying investments held by the Principal TDFs and received management fees from those portfolios. Because it was identified in the Declaration of Trust and participation agreements as a fiduciary as to every plan with assets invested in the Principal TDFs, and acknowledged its fiduciary role in its agreement with Principal Trust, PMC qualifies as an "investment manager" under 29 U.S.C. § 1002(38), and is thus a named fiduciary for every plan with assets invested in the Principal TDFs pursuant to 29 U.S.C. § 1102(c)(3). Further, PMC is a fiduciary pursuant to 29 U.S.C. § 1002(21)(A)

PAGE 12 – CLASS ACTION ALLEGATION COMPLAINT

because it exercised discretionary authority and control with respect to the management or disposition of plan assets, and because it rendered investment advice for a fee or other compensation with respect to plan assets.

35.    Defendant Principal Life is one of America's largest life insurance companies and a retirement plan recordkeeper and product vendor that served as recordkeeper to the Plan during the relevant period.  At all times material hereto, Principal Life as the Plan's recordkeeper was a party in interest under ERISA and a fiduciary to Plaintiffs and the Plan because it exercised discretionary control and authority over Plan assets, among them being the monies that became Principal Life's recordkeeping fees relating to the administrative services it provided to Plaintiffs and the Plan.

36.    Each of the Defendants identified above is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.[4]

## LEGAL AND FACTUAL BACKGROUND

## COLLECTIVE INVESTMENT TRUSTS

37.    A collective investment trust fund like the TDF series at issue here is a pooled investment vehicle maintained by a bank or trust company that is available exclusively to qualified retirement plans exempt from federal income tax including 401(k) plans and certain government plans. The TDFs are organized pursuant to a Declaration of Trust. Each plan that invests in the TDFs enters into a participation agreement with the TDFs and their trustee.

---

[4] 2014 Brochure at 1, 7.

PAGE 13 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

38.     The trustee of the TDFs is an ERISA fiduciary to the extent that the assets of an ERISA-covered plan are invested in the TDF. *See* Dep't of Labor Advisory Opinion 2005-09A, at 5 (May 11, 2005) (explaining that the manager of a collective investment trust "is a fiduciary under section 3(21) of ERISA with respect to ERISA-covered plans for which it serves as a trustee"), available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/advisory-opinions/2005-09a.pdf. As the 1974 ERISA Conference Committee Report explained, "banks, trust companies, and insurance companies [that] maintain pooled investment funds for plans . . . are, of course, plan fiduciaries" who must manage the funds "for the exclusive benefit of participants and beneficiaries." H.R. Rep. No. 93-1280, 1974 WL 324168, at *61 (Aug. 12, 1974). The SEC concurs, explaining that "any person who exercises authority or control respecting the management or disposition of the underlying assets of the collective trust fund . . . and anyone providing investment advice with respect to such assets for a fee (direct or indirect), is a fiduciary of the plan" who is "subject to all of the duties and liabilities imposed upon plan fiduciaries" by ERISA. SEC Division of Investment Management, Staff Guidance and Studies, 1992 WL 12623680, at *96 (May 1, 1992).

### TARGET DATE FUNDS AND THE FUND-OF-FUNDS STRUCTURE

39.     A target date fund invests in a diversified mix of asset classes managed towards a particular target (retirement) date, or the approximate date when the investor expects to start withdrawing money from the fund. For example, the Principal LifeTime Hybrid 2030 Fund is designed for an investor who expects to retire around 2030. As the target date approaches, the investment mix becomes more conservative, typically by shifting away from stock investments towards more conservative fixed income investments. However, target date funds are not limited to stocks and bonds, and often use asset classes such as commodities, real estate, inflation-linked

PAGE 14 – CLASS ACTION ALLEGATION COMPLAINT

bonds or emerging markets stocks. A target date fund's asset allocation over the lifespan of the investment is called its "glide path." Investment companies offer target date funds as a suite, meaning that they offer funds with an array of target dates staggered either 5 or 10 years apart, along with an "income" or "retirement" fund for investors who have already retired.

40.     To accomplish this target asset allocation and diversification across numerous asset classes, the vast majority of target-date funds use a "fund-of-funds" structure in which the target-date fund invests its assets in other pooled investment products. For target-date mutual funds, these pooled investment products typically include other mutual funds or exchange-traded funds. For target-date collective trusts like the TDFs at bar, the pooled investment product holdings often include other collective investment trusts, annuity separate accounts, mutual funds and exchange-traded funds.

**THE MARKETPLACE FOR INDEX FUNDS IN RETIREMENT PLAN INVESTMENTS**

41.     An index fund is a passively managed, pooled investment product designed to mirror the performance of a particular benchmark index. For example, S&P 500 index funds aim to track the Standard & Poor's 500 Index, a market capitalization-weighted index of the 500 largest publicly traded companies in the United States. The marketplace for index funds has evolved such that for asset classes such as large cap stocks, small cap stocks, foreign stocks and domestic bonds, there are generally dozens of different products available that track a benchmark index for the particular asset class involved. These products are not limited to the best-known index associated with the asset class. For example, not only are there numerous products that track the S&P 500, there are also numerous products that track the Russell 1000, another index that tracks large-cap domestic stocks. Regardless of the benchmark index that an investor wants to track, there will generally be several products in the marketplace from which to choose.

PAGE 15 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

42.    The marketplace for index funds is also highly competitive, with several companies offering index fund products that track benchmark indices with a high degree of precision while charging very low fees.

43.    The competitiveness of the marketplace for index funds is particularly robust within the retirement plan segment given that retirement plan investors have a unique ability to invest in collective investment trust vehicles, which generally have lower expenses than comparable mutual funds.

44.    In recent years, numerous investment management companies have distinguished themselves in the marketplace by offering highly competitive index fund products based on several competitive advantages: a high degree of institutional expertise at indexing, sophisticated trading platforms that minimize trading costs and a large asset base that provides economies of scale. As a result, these companies—among them, BlackRock, BNY Mellon, Northern Trust, State Street and Vanguard—have captured a very large percentage of market share of passively-managed assets among large plans and investors in the retirement plan segment.[5]

45.    Though the marketplace for index funds is very competitive, that does not mean that the offerings within that marketplace are uniformly competitive. Some index funds charge fees that are five, ten or even twenty times higher than those charged by another fund tracking the exact same index. Furthermore, a higher level of fees does not in any way correspond to a higher quality product or higher level of services. On the contrary, the least expensive offerings often have the lowest level of tracking error, meaning that they track the index with the highest level of precision.

---

[5] *See* Albertsons & Safeway DC Investment Structure*, Terraza v. Safeway*, No. 4:16-cv-03994-JST, ECF 84-19, at 11 (N.D. Cal. June 22, 2017) (report from Aon Hewitt reviewing available marketplace offerings for Safeway plan, listing BlackRock, Vanguard, State Street, Northern Trust, and BNY Mellon as the "top 5 index managers").

PAGE 16 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

46.     The Restatement of Trusts makes note of the competitive and variant nature of the marketplace for investment products, emphasizing that prudent fiduciaries must be aware of the "availability and continuing emergence of modern investment products, not only with significantly varied characteristics but also with similar products being offered with significantly differing costs." Restatement (Third) of Trusts ch. 17, intro. note (2007). An ERISA fiduciary and party in interest like Defendants here, therefore "cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison Int'l*, 843 F.3d at 1198; *see also Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 Civ. 9936 (LGS), 2016 WL 5957307, at *6 (S.D.N.Y. Oct. 13, 2016) (offering "proprietary index funds . . . [that] charged fees that were excessive compared with similar investment products" supported breach of fiduciary duty claim); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. SACV 15-1614-JLS (JCGx), 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) ("fail[ure] to investigate lower-cost options with comparable performances" supported breach of fiduciary duty claim).

47.     57.     Once a fiduciary has identified a particular market index that it seeks to track, a prudent fiduciary primarily considers three interrelating factors when choosing which index fund to use to track the chosen index. The first factor is costs. Because an index fund, all things being equal, will produce returns equal to the performance of its benchmark index minus the fees charged by the index fund, fees are a significant determinant of index fund performance.

48.     The second factor to consider in evaluating index funds is tracking error, which measures how far the index fund's return has historically deviated from the return of the benchmark index. Tracking error does not look to whether the deviation is negative or positive,

PAGE 17 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

because either type of variance demonstrates that the index fund's investments did not produce a return that mirrored that of the index, which is the fund's objective.

49.    As an aspect of measuring tracking error, prudent fiduciaries pay particular attention to negative tracking error, meaning index fund performance that trails the underlying index. Prudent fiduciaries will pay particular attention to negative tracking error because while some sources of tracking error relate to tracking failure, and can result in either outperformance or underperformance, some causes of tracking error—cash drag, inefficient trading systems and illiquidity—have a generally negative effect on performance. Because chronically negative performance is worse than merely random underperformance, prudent fiduciaries will seek to avoid index funds that consistently underperform their index on a pre-fee basis, as it will tend to indicate a manager plagued by cash drag, inefficient trading or illiquidity. Further, because issues with trading efficiency, cash drag and illiquidity all relate to the amount of assets within the index fund and the skill of the managers, they tend to replicate over time and thus are often predictive of future underperformance.

50.    The third factor that prudent fiduciaries will consider in selecting an index fund is institutional experience and expertise. In the retirement plan investing industry, years of indexing experience and passive assets under management are important metrics to review when looking at passive managers. Firms with large amounts of passive assets under management are able to leverage their size and scale to more closely track benchmarks relative to competitor retirement investment managers in the same market space. Thus, in assessing a particular index strategy, a prudent fiduciary will look at each manager's experience managing the particular strategy and the amount of assets managed according to that strategy, but also broader factors such as the

PAGE 18 – CLASS ACTION ALLEGATION COMPLAINT

manager's overall experience with index investing and its passive assets under management in the particular asset class (*i.e.*, domestic equity or domestic fixed income).

51.    Taken together, in reviewing index fund managers, a prudent fiduciary will look at fees, tracking errors, performance history, the manager's experience with the specific strategy and the manager's assets under management with the particular strategy.

52.    Given the competitiveness of the index fund marketplace, and the rapid evolution of the available products in terms of their features and the level of fees, investment managers of a multi-billion dollar portfolio of index fund holdings will closely monitor the cost and performance of the index funds in their portfolio while regularly comparing that cost and performance to the fund's closest competitors, making changes when warranted based on the fees, tracking error and institutional quality of other products in the marketplace.

### PRUDENT SELECTION OF INVESTMENT VEHICLES

53.    There are a number of different vehicles that pool the money of investors and centrally manage that money according to a particular investment objective. Examples include mutual funds, exchange-traded funds, collective investment trusts, annuity separate accounts or even simply direct ownership of securities in a separate account structure.

54.    These vehicles may differ in terms of their legal structure, regulatory oversight and product features. However, these vehicles may not differ in terms of their underlying investments. It is quite common for investment management companies to offer multiple versions of the same investment strategy in different vehicles. For example, BlackRock has offered its S&P 500 index strategy as a mutual fund, annuity separate account, exchange traded fund and collective investment trust, while Fidelity has offered its Contrafund investment as a mutual fund, an annuity separate account and a collective investment trust. These strategies

PAGE 19 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

typically invest in identical portfolios of investments, with the only differences being features such as fees and investment minimums that relate to the particular vehicle.

55.     In selecting investments, the manager of a fund-of-funds portfolio must choose not only which investment manager to hire for a particular portion of the portfolio, but also whether the chosen strategy is available in multiple vehicles, and which of those vehicles will best serve the interests of investors.

56.     Due to high asset minimums and other factors, collective investment trust fund-of-fund managers typically have the widest array of choices available, subject to limitations imposed by the relevant declaration of trust, allowing them to select other collective investment trusts, mutual funds, separately managed accounts, annuity separate accounts and exchange-traded funds.

57.     Given this flexibility, it is relatively uncommon for collective trust-organized funds-of-funds to own mutual funds as underlying investments. That is because the compliance requirements of applicable federal securities laws pertaining to mutual funds generally result in mutual funds having the highest level of costs among the various vehicles. Furthermore, collective trust fund managers are sufficiently sophisticated that they do not require disclosures such as a prospectus or semiannual report of holdings such as those mandated by federal securities law pertaining to mutual funds. In addition, the mutual fund structure of an underlying fund confers no benefit upon investors in a fund-of-funds collective trust vehicle like the TDFs at issue here because such investors have been held to lack standing to enforce federal law provisions relating to mutual fund fees associated with so-called underlying funds in a fund-of-funds structure. *See Amer. Chem. & Equip. Inc. 401(k) Ret. Plan v. Principal Mgmt. Corp.*, 864 F.3d 859, 865 (8th Cir. 2017). In contrast, using collective trusts, annuity separate accounts and separately managed

 PAGE 20 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

accounts as underlying funds offers significantly enhanced protections to both the fund-of-funds and its investors because the managers of collective trusts, annuity separate accounts and separately-managed accounts are all ERISA fiduciaries whenever the monies invested with them are from ERISA plans. Finally, features such as daily liquidity, daily valuation (sometimes referred to as "mark-to-market") and holdings transparency can be provided by annuity separate accounts as well as collective investment trusts.[6]

58.     Because investment strategies from a particular manager are often available in different vehicles, a prudent manager of a fund-of-funds investment product will investigate the availability of different vehicles implementing the same strategy. And where those vehicles offer virtually identical investment portfolios, prudent managers of a fund-of-funds portfolio will use the vehicle that charges the lowest costs, as that vehicle will generally provide the best performance for investors in the fund-of-funds.

**PRUDENT INVESTIGATION, SELECTION AND
MONITORING OF SHARE CLASSES**

59.     Selecting the appropriate investment vehicle does not end the fund-of-fund manager's task. The manager must further select which share class of the investment vehicle to use.

60.     Mutual funds, annuity separate accounts and collective investment trusts often offer multiple classes of shares of the same investment that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower-cost share classes are targeted at institutional investors with more assets. For example, the lowest cost share class of many index mutual funds and target-date funds have an

---

[6] *See* Coal. of Collective Inv. Trusts, *Collective Inv. Trusts White Paper,* at 8, 10 (Mar. 2015), https://www.seic.com/sites/default/files/2022-05/SEI-STC-CCIT-WhitePaper.pdf.

PAGE 21 – CLASS ACTION ALLEGATION COMPLAINT

investment minimum of several hundred million dollars. There is no difference between share classes other than the cost—the different share classes of a particular vehicle hold identical investments.

61.     Higher-cost share classes may make revenue sharing payments to cover administrative costs associated with offering the investment to thousands of participants in a defined contribution plan menu. However, funds-of-funds do not have such costs, as the fund itself is the only owner of shares and thus incurs no such administrative costs in connection with a particular underlying investment. Therefore the only scenario in which it would be appropriate for a fund-of-funds to use a higher-cost share class of an underlying fund is if the increase in revenue sharing payments is *greater* than the fee differential between the share classes and the fund-of-funds manager refunded the entirety of those revenue sharing payments back to affected plan participant investors.

62.     A prudent retirement plan fiduciary managing a fund-of-funds will use its assets and negotiating power to use the cheapest share class available. The fiduciary will likewise pull its money from any investment manager that fails to make available the lowest-cost share class if that share class is being made available to other investors with lower or similar amounts of assets. Finally, the prudent fund-of-funds manager engages in routine monitoring to determine whether a lower-cost share class of any of its investments has become available and transfer to that lower-cost share class whenever it would be in the interest of participants.

PAGE 22 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

## DEFENDANTS' VIOLATIONS OF ERISA IN MANAGING THE PRINCIPAL TDFs

### I.     INVESTMENT STRUCTURE OF PRINCIPAL TDFS

63.     The operation of the Principal TDFs is governed by the Declaration of Trust. Pursuant to the Declaration of Trust, Principal Trust Company operated as the trustee from the inception of the Principal TDFs in 2009 until the present. The Principal TDFs consist of a series of trusts, all but one of them bearing a specific retirement target date ranging from 2020 to 2070. One Principal TDF is the "Income" fund for investors who have already reached their investment time horizon, as Defendants' marketing literature puts it.

64.     Each of the Principal TDFs operates with all investors' assets pooled together. Each investor owns a certain number of units, with each unit representing a proportionate undivided interest in the Principal TDF. The value of each unit is determined by the total market value of the assets held by the Principal TDF divided by the number of existing units. The Plan in which Plaintiffs Smith and East here are invested is part of this pooled investment structure, which is subject to ERISA.

65.     The Principal TDFs have since their inception used a fund-of-funds investment structure in which the assets of the Principal TDF are invested in other pooled investment vehicles. Pursuant to the Declaration of Trust, each of the Principal TDFs is permitted to invest in collective investment trusts, annuity separate accounts, mutual funds or directly in securities.

66.     From the launch of the Principal TDFs through the relevant period here, the Declaration of Trust and its supplements have outlined four fee components for each of the Principal TDFs. These four components are identified as the: (1) service fee, (2) non-advisory trustee fee, (3) operating expenses and (4) underlying investment expenses. The fee structure outlined in each Supplement is identical to the other Principal TDFs, other than the name of the

PAGE 23 – CLASS ACTION ALLEGATION COMPLAINT

fund. The fee section contained within the supplement for the Principal LifeTime Hybrid 2020 TDF stated, for example, as follows:

3.      **Investment Classes and Fees:**

*Service Fee.* There are multiple share classes available under the Principal LifeTime Hybrid 2020 CIT. With the exception of the I Share Class, the Y Share Class and the Z Share Class, there is a Service Fee that varies depending on the share class selected by the Authorizing Fiduciary in the participation agreement between the Participating Trust and the Trustee. The Service Fee included in the share class selected by the Authorizing Fiduciary is identified on the attached Share Class Appendix.

*Non-Advisory Trustee Fee.* All share classes include a Non-Advisory Trustee Fee of four (4) basis points.

*Operating Expenses.* Operating Expenses may be paid from one or more Funds, as described in Sections 4.4 and Article VII of the Trust.

*Underlying Investment Expenses.* The fees and expenses described above are in addition to fees charged by underlying investments in the Principal LifeTime Hybrid 2020 CIT.

Declaration of Trust, Principal LifeTime Hybrid 2020 TDF Supplement.

67.     The non-advisory trustee fee, operating expenses and underlying investment expenses are uniform for all investors in a particular Principal TDF. The service fee varies between 0 and 60 bps depending upon the share class selected by the participating plan. The service fee is paid to the participating plan or its trustee/recordkeeper to assist in the payment of administrative expenses related to the operation of its plan.[7]

68.     The Principal TDFs' fee structure allowed Defendants to increase their compensation at the expense of Plaintiffs East and Smith here and other ERISA-covered retirement investors nationwide by enabling Defendants to select as the underlying funds for the TDFs the Principal family of companies' proprietary investments—and it also allowed Defendants sometimes to select more expensive *versions* of those investments for use as the TDFs' underlying funds.

---

[7] The non-advisory trustee fee of 3 bps (.03%) is intended to cover the administrative costs of operating the Principal TDFs, which includes all recordkeeping-related expenses.

PAGE 24 – CLASS ACTION ALLEGATION COMPLAINT

69.    This structure is not inherent to TDFs operated using a fund-of-funds structure. Some trustees of target-date fund series charge a fixed overall fee, then either use that fee to pay the fees associated with the underlying investment options or else invest the assets of the target-date funds involved in no-fee versions of underlying investments managed by affiliates.

70.    The Principal TDFs' investment process is described in Defendants' sales literature. First, Defendants determined which asset classes would make up the TDFs. Second, Defendants determined the percentage allocations to each asset class throughout the investor's investment lifespan, known as the glide path. Third, Defendants constructed each Principal TDF's investment portfolio, which involved "the selection and monitoring of the Target Date Funds' underlying investment options and investment managers." 2014 Brochure at 4. Defendants' ERISA breaches in this case relate entirely to this third step—the selection and monitoring of the Principal TDFs' underlying investment options.

71.    As part of this third step, "[t]he investment team identifies asset classes they believe will provide the greatest opportunities to outperform their corresponding indexes through active management. They also identify asset classes less likely to outperform their indexes, after fees are taken into account, and represent those through passively-managed investment portfolios." 2018 Brochure at 6.

72.    After performing this analysis, Defendants determined that four asset classes should be represented by index funds: large cap stocks would be represented by an index fund tracking the Standard & Poor's 500 Index; bonds would be represented by the Bloomberg Barclays Aggregate Bond Index; midcap stocks would be represented by the S&P Midcap 400 Index; and small cap stocks would be represented by the S&P SmallCap 600 Index. Accordingly, since their inception, the Principal TDFs have used an index fund tracking each of these four

PAGE 25 – CLASS ACTION ALLEGATION COMPLAINT

indices as the sole vehicle for providing exposure to large cap stocks, bonds, mid cap stocks and small cap stocks.

73.    To represent the remaining asset classes, such as international stocks, high yield bonds, real estate and inflation-linked bonds, Defendants used actively managed investments affiliated with Principal. Throughout the relevant period, each Principal TDF has generally been made up of between 10 and 13 underlying investment options. These options have consisted of a mix of mutual fund, annuity separate account, and collective investment trust vehicles. Below is the asset allocation for all thirteen Principal TDFs as of May 31, 2025.

| Underlying Investment Option | Principal LifeTime Hybrid Income CIT | Principal LifeTime Hybrid 2015 CIT | Principal LifeTime Hybrid 2020 CIT | Principal LifeTime Hybrid 2025 CIT | Principal LifeTime Hybrid 2030 CIT | Principal LifeTime Hybrid 2035 CIT | Principal LifeTime Hybrid 2040 CIT | Principal LifeTime Hybrid 2045 CIT | Principal LifeTime Hybrid 2050 CIT | Principal LifeTime Hybrid 2055 CIT | Principal LifeTime Hybrid 2060 CIT | Principal LifeTime Hybrid 2065 CIT | Principal LifeTime Hybrid 2070 CIT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S&P 500 Sep. Acct. | 20.36% | 20.50% | 24.42% | 28.43% | 33.67% | 38.72% | 45.79% | 51.06% | 55.41% | 56.22% | 56.22% | 56.16% | 56.06% |
| S&P 400 Sep. Acct. | — | — | — | — | 3.05% | 3.50% | — | — | — | 5.09% | — | — | — |
| S&P 600 Sep. Acct. | — | — | — | — | 2.70% | 3.10% | — | — | — | 4.51% | — | — | — |
| International Equity Fund | — | — | — | — | 14.69% | 16.90% | — | — | — | 24.53% | — | — | — |
| Intl SmallCap | — | — | — | — | — | 0.85% | — | — | — | 1.23% | — | — | — |
| Emerging Markets Fund | 0.92% | 0.93% | 1.10% | 1.28% | 1.52% | 1.75% | 2.07% | 2.31% | 2.50% | 2.54% | 2.54% | 2.54% | 2.54% |
| Inflation Protection Fund | 5.78% | 5.76% | 5.20% | 4.56% | 3.82% | — | — | — | — | — | — | — | — |
| Bond Market Index Sep. Acct. | 34.61% | 34.52% | 32.49% | 31.33% | 28.16% | 28.66% | 18.05% | 10.13% | 3.94% | 2.77% | 2.79% | 2.81% | 2.83% |
| Real Estate Securities Fund | — | — | — | — | 1.80% | 2.25% | — | — | — | 2.20% | — | — | — |
| High Yield Fund | 6.38% | 6.36% | 5.73% | 5.03% | 4.51% | 4.25% | 3.13% | 2.24% | 1.16% | 0.90% | 0.91% | 0.91% | 0.92% |
| Short-Term Income Fund | — | — | — | — | 4.84% | — | — | — | — | — | — | — | — |
| Mututal F | 8.87% | 8.93% | 10.64% | 12.39% | — | — | 19.95% | 22.24% | 24.14% | — | 24.49% | 24.45% | 24.38% |
| CIT US R | 1.75% | 1.75% | 1.73% | 1.73% | — | — | 2.22% | 2.21% | 2.19% | — | 2.22% | 2.23% | 2.24% |
| CIT Intl | — | — | — | — | — | — | 0.99% | 1.11% | 1.20% | — | 1.23% | 1.26% | 1.32% |
| CIT Shor | 16.96% | 16.91% | 13.60% | 9.39% | — | — | — | — | — | — | — | — | — |
| Midcap S | 1.84% | 1.84% | 2.19% | 2.55% | — | — | 4.13% | 4.62% | 5.01% | — | 5.10% | 5.11% | 5.16% |
| Smallcap | 1.63% | 1.64% | 1.95% | 2.27% | — | — | 3.67% | 4.09% | 4.44% | — | 4.52% | 4.53% | 4.55% |

74.    As of the end of 2024, approximately 7,800 retirement plans had participants invested in one or more of the Principal TDFs. On information and belief, based upon applicable Form 5500 documents, an affiliate of Defendants acted as the recordkeeper for all of these plans during the time in which they have been invested in the Principal TDFs.

75.    The Principal TDFs' fee structure resulted in Defendants earning more than reasonable compensation for managing the TDFs as set forth below, in violation of ERISA's prohibited transaction rules. Plaintiffs in making this allegation do not object per se to the asset

PAGE 26 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

allocation models used by Defendants or Defendants' decision to use passively or actively managed investments to represent particular asset classes. As described throughout this Complaint, Plaintiffs' allegations relate to the selection, monitoring, and retention of the particular underlying investments of the Principal TDFs.

**II.     DEFENDANTS INVESTED THE ASSETS OF THE PRINCIPAL TDFS IN HIGH COST, POOR PERFORMING PROPRIETARY INDEX FUNDS IN THEIR OWN SELF-INTEREST AND AT THE EXPENSE OF PLAINTIFFS AND OTHER RETIREMENT INVESTORS.**

76.     As described above, throughout the relevant period, the Principal TDFs had 60 to 70 percent of their assets—at all times over $1 billion—invested in index funds that tracked the S&P 500; the Bloomberg Barclays U.S. Aggregate Bond Index; the S&P Midcap 400; and the S&P Small Cap 600. Each of the Principal TDFs has been invested in all four of these index funds, with the average Principal TDF having usually around 40% of its assets in the large cap index fund, 15% of its assets in the bond index fund, 4% in the midcap index fund, and 4% in the small cap index fund.

77.     There are numerous investment managers in the marketplace (including BlackRock, BNY Mellon, Northern Trust, State Street, and Vanguard) that, throughout the relevant period, offered products tracking one or more of these same four indices with a high degree of precision while charging very low fees. With over $1 billion in assets to invest here on behalf of Plaintiffs and the proposed TDF class, Defendants had sufficient size and bargaining power to qualify for the cheapest share class of any of these products.

78.     Defendants failed to investigate these marketplace alternatives, choosing instead to further their own self-interest by using proprietary index fund products from Principal to track all four indices. Defendants utilized Principal's index funds despite the fact that they charged fees that were significantly higher than the fees charged by more competitive options.

 PAGE 27 – CLASS ACTION ALLEGATION COMPLAINT

79.    Not only were the Principal index funds more expensive than other available options, but they were of significantly lower quality than the other options when it came to their sole function—tracking the underlying index. For the past decade or more, Principal's index funds have consistently had among the highest rates of tracking error among their peers.[8]

80.    To wit, an "Investment Option Summary" dated June 30, 2025, that the Plan's administrator provided to Plaintiff East in response to his written request for Plan documents shows, for instance, that the Principal LifeTime Hybrid 2030 TDF and the Principal LifeTime Hybrid 2040 TDF that Plaintiff East owns trail one of their two Plan-designated benchmarks—viz, the S&P Target Date 2030 Index and the S&P Target Date 2040 Index—for the three-month, year-to-date, one-year, three-year, five-year and ten-year performance reporting periods (in other words, for every provided performance measurement period) except for the ten-year period as to the S&P Target Date 2030 Index, where the Principal TDF in question is tied with the ten-year benchmark. As set forth here, this long-running underperformance of the TDFs as a matter of investment return relative to benchmarks chosen by Principal itself owes in significant part to excessive fees that Defendants extract from TDF investors like Plaintiffs and the proposed classes here at the underlying fund level, where Defendants consistently choose

_____

[8] See *PBIJX Principal Bond Market Index Fund*, Principal Asset Management, https://www.principalam.com/us/fund/pbijx(last accessed Apr. 13, 2026); *PNIIX Principal Bond Market Index Institutional Class*, Morningstar (Feb. 28, 2026), https://www.morningstar.com/funds/XNAS/PNIIX/quote; Erich Pingel et al., *A Bond Index Fund's Balancing Act: Tracking Error and Cost*, Vanguard (Mar. 2025), https://corporate.vanguard.com/content/dam/corp/research/pdf/a_bond_index_funds_balancing_act_tracking_error_and_cost.pdf; *Understanding the Nuances of Bond Index Fund Tracking*, Vanguard (Apr. 22, 2025), https://workplace.vanguard.com/insights-and-research/perspective/understanding-the-nuances-of-bond-index-fund-tracking.html; *FXNAX Fidelity U.S. Bond Index Fund*, Fidelity, https://fundresearch.fidelity.com/mutual-funds/summary/316146356 (last accessed Apr. 13, 2026); *Fidelity U.S. Bond Index Fund SEC Yield is TRAILING*, Bogleheads.org (Oct. 4, 2021), https://www.bogleheads.org/forum/viewtopic.php?t=359466; *SWAGX Schwab U.S. Aggregate Bond Index Fund*, Charles Schwab, https://www.schwabassetmanagement.com/products/swagx (last accessed Apr. 13, 2026).

PAGE 28 – CLASS ACTION ALLEGATION COMPLAINT

to use their own proprietary index fund and managed fund products to be the underlying funds of the TDFs rather than superior and less expensive funds offered by non-Principal investment fund complexes. These fees from the underlying funds significantly and wrongfully reduced the investment returns of the TDFs for Plaintiffs and the proposed classes here.

81.    This resulted in Defendants obtaining more than reasonable compensation under ERISA, in violation of ERISA's prohibited transaction rules. Section 1106(a)(1)(C) of ERISA contains three elements. It prohibits ERISA fiduciaries from (1) "caus[ing a] plan to engage in a transaction" (2) that the fiduciary "knows or should know . . . constitutes a direct or indirect . . . furnishing of goods, services, or facilities" (3) "between the plan and a party in interest." *Id*. As the Supreme Court recently stated in *Cunningham v. Cornell University*, 604 U.S. 693, 700 (2025), ERISA Section 1106(a)(1)(C)'s "bar is categorical: Any transaction that satisfies its three elements is presumptively unlawful." *Id*. If Defendants here can establish as a pleaded-and-proven affirmative defense that all of the compensation they received from the Plan was for "'services necessary for the . . . operation of the plan' *and* 'no more than reasonable compensation [was] paid therefor,' § 1108(b)(2), they cannot be held liable for causing the plan to enter into the transaction[s]" complained of here. *Id.* at 702. Courts in ERISA cases like this examine the quality of the investment management services in dispute in applying ERISA's "reasonable compensation" defense to prohibited transaction claims. *See, e.g., Brock v. Robbins*, 830 F.2d 640, 644 (7th Cir. 1987).[9] And the subpar investment returns of the TDFs (with their layers of embedded, unreasonably high fees going to Defendants via the underlying funds) as measured by mainstream benchmarks like the S&P Target Date indices used by Defendants

---

[9] The Second Circuit has also looked to the profitability of the fund to the adviser-manager in determining whether compensation is reasonable or in violation of a fiduciary duty. *Krinsk v. Fund Asset Mgmt., Inc.,* 875 F.2d 404, 409 (2d Cir. 1989).

PAGE 29 – CLASS ACTION ALLEGATION COMPLAINT

themselves indicates that the quality of the investment management services Plaintiffs obtained from Defendants by paying these fees was consistently very poor.

82.     Institutional factors also demonstrate the superiority of passive managers other than Principal. Vanguard has been managing index fund investments for almost 50 years and manages over $8 trillion in index funds. State Street has been managing index fund investments for 32 years and manages over $5 trillion in index funds. BlackRock manages over $6.5 trillion in index funds. Each company offers over 100 different passive investment strategies. By comparison, Principal in total, manages less than $800 billion in assets and has only been managing index fund investments since the year 2000.[10]

83.     To demonstrate Defendants' failure to prudently and loyally manage the Principal TDFs' index fund investments, below is a performance chart covering the years 2018 through 2024 for the Principal Large Cap S&P 500 Index Fund used by Defendants and several other S&P 500 index fund products used by the fiduciaries of other target-date fund collective investment trusts, and the average over/under performance during those years. Other columns show the average annual tracking error during the time period and the annual fee for each product as of December 31, 2024.

| | Annual Performance for years: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Average Tracking Error | Fee |
| Principal Large Cap S&P 500 Index Separate Account | -4.83% | 30.95% | 17.88% | 28.10% | -18.43% | 25.74% | 14.55% | 13.42% | 0.30% | 0.13% |
| Blackrock Equity Index NL F | -4.40% | 31.47% | 18.35% | 28.65% | -18.10% | 26.20% | 14.71% | 13.84% | 0.05% | 0.02% |
| Northern Trust S&P 500 Index Fund- NL- Tier J | -4.49% | 31.48% | 18.38% | 28.68% | -18.12% | 26.25% | 14.82% | 13.86% | 0.06% | 0.03% |
| Vanguard Institutional Index (VIIIX) | -4.38% | 31.49% | 18.40% | 28.71% | -18.11% | 26.29% | 14.77% | 13.88% | 0.03% | 0.02% |

84.     The chart shows that year after year, the Principal S&P 500 index option significantly underperformed compared to peer index fund competitors. Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other

---

[10] *Principal Financial reports $717.9 billion in assets under management,* Investing.com (Apr. 17, 2025, 06:17 AM), https://www.investing.com/news/sec-filings/principal-financial-reports-7179-billion-in-assets-under-management-93CH-3990191.

PAGE 30 – CLASS ACTION ALLEGATION COMPLAINT

similarly-situated fiduciaries, there was ample evidence during every year of the relevant period that the Principal option should have been replaced with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed.

85.    The underperformance of Principal's S&P 500 index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P 500 index tracking. As of September 2014, Principal managed less than $20 billion of assets in S&P 500 index products, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $138 and $400 billion in products tracking the S&P 500.[11] These companies' dominance in the field of S&P 500 index tracking dates back to before the beginning of the relevant period and continues today. Additionally, these four companies have all been managing S&P 500 index-tracking products since the late 1970s, while Principal did not launch an S&P 500 index-tracking strategy until 2000.[12]

86.    Defendants' disloyal and imprudent index fund management was not limited to the S&P 500 index fund used by the Principal TDFs. Defendants also used a proprietary Principal [13] index fund that tracked the Bloomberg Barclays U.S. Aggregate Bond Index, despite the fund's historical underperformance and the availability of several marketplace alternatives that tracked the *exact same index* with lower tracking error, better historical performance on a pre-fee basis and fees that were 3 to 4 times lower than the fees charged by Principal.

---

[11] These market numbers are as of December 31, 2024. The chart further shows that the Principal option had the highest level of tracking error during this six-year period and the highest fees as of December 31, 2024.

[12] Hewitt Index Fund Report at 4. Data from Morningstar shows that as of the end of 2017, Principal had $21 billion in S&P 500-tracking assets under management, while Northern Trust, BlackRock, State Street, and Vanguard all managed between $148 and $645 billion.

[13] Mercer Index Fund Report at 25.

PAGE 31 – CLASS ACTION ALLEGATION COMPLAINT

87.    Below is a performance chart covering the years 2018 through 2024 for the Bloomberg Barclays U.S. Aggregate Bond Index itself, the Principal Bond Market Index Fund used by Defendants and several other index fund products that track the Bloomberg Barclays U.S. Aggregate Bond Index that were used by the fiduciaries of other target-date fund collective investment trusts. The chart also shows the average annual tracking error for each bond index fund product as well as each product's annual fee as of December 31, 2024.

| | Annual Performance for years: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Average Tracking Error | Fee |
| Bloomberg Barclays US Aggregate Bond Index | 0.00% | 8.45% | 7.67% | -0.60% | -14.36% | 6.36% | 2.88% | 1.49% | N/A | 0.00% |
| Principal Bond Index Separate Account | 0.00% | 8.00% | 7.10% | -1.10% | -14.80% | 5.93% | 2.41% | 1.08% | 0.30% | 0.14% |
| Blackrock US Debt Index NL F | 0.30% | 8.45% | 7.67% | -0.73% | -14.36% | 6.08% | 2.57% | 1.43% | 0.05% | 0.04% |
| Northern Trust Aggregate Bond Index Fund NL Tier J | 0.00% | 8.43% | 7.65% | -0.52% | -14.45% | 6.06% | 2.78% | 1.42% | 0.06% | 0.07% |

88.    The chart shows that year after year, the Principal bond index option significantly underperformed both its benchmark index and index fund competitors in the marketplace. The chart further shows that the Principal option had the highest level of average tracking error, 5 to 10 times higher, during this six-year period and the highest level of fees as of December 31, 2024. Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of target-date fund TDFs, they would have replaced the Principal bond index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed above. But they did not do so because Defendants were able to earn unreasonably remunerative fees from using Principal's own proprietary investment products as the underlying funds for the TDFs instead.

PAGE 32 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

89.     The underperformance of Principal's bond index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of passive fixed income management. BlackRock, Northern Trust and Vanguard have all been managing passive fixed income assets for over thirty years, while Principal's bond index fund is roughly half as old. And as of the end of 2024, Principal managed $6.5 billion in Bloomberg Barclays Aggregate Bond Index-tracking products (excluding monies invested by the Principal TDFs), while Northern Trust, BlackRock and State Street all managed between $3 and $300 billion in products tracking the same index.

90.     This self-serving use of proprietary index funds is underscored by Defendants' historical conduct in managing the Principal TDFs' bond holdings. Prior to 2013, one of the Principal TDFs' underlying holdings was a bond index CIT managed by BNY Mellon that charged a fee of 0.06% per year. In 2013, Defendants replaced the BNY Mellon bond index CIT with the Principal Bond Index fund despite the fact that BNY Mellon managed both of these funds (acting as the advisor to its own product and the subadvisor to Principal's bond index product), and the Principal option charged fees that were 2.5 times higher than the BNY Mellon option. Given that the funds tracked the exact same index and had the exact same managers, there does not appear to be any justification for this change other than to increase the fee revenue received by Defendants and their Principal affiliates and to increase the asset base of Principal's bond index fund, all directly at the expense of participant investors like Plaintiffs.

91.     Defendants' use of a proprietary index fund product to track the S&P Midcap 400 Index was similarly disloyal and imprudent. Again, throughout the relevant period, Defendants used a proprietary Principal index fund to track the S&P Midcap 400 despite the availability of marketplace options with superior long-term performance on a pre-fee basis, lower tracking

PAGE 33 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

error and lower fees. Below is a chart showing the annual performance from 2018 to 2024 of the S&P Midcap 400 Index itself, the Principal MidCap S&P 400 Index Fund used by Defendants in the Principal TDFs and several other index fund TDFs that track the S&P Midcap 400 Index and were used by the fiduciaries of other target-date fund collective investment trusts. The chart also shows the average tracking error of each product during this period as well as each product's annual fee as of December 31, 2024.

92.     The chart shows that year after year, the Principal midcap index option significantly underperformed both its benchmark index and index fund competitors in the marketplace. The chart further shows that the Principal option had the highest level of tracking error 5 to 10 times higher, as well as the highest fees among these options. Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other fiduciaries of target date fund TDFs, they would have replaced the Principal mid-cap index option with one of the more competitive alternatives in the marketplace such as those listed above, all of which were available to Defendants in the share class listed here.

| | Annual Performance for years: | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Average Performance | Average Tracking Error | Fee |
| S&P MidCap 400 Index | -11.08% | 26.20% | 13.66% | 24.76% | -13.06% | 16.44% | 13.93% | 10.12% | N/A | 0.00% |
| Principal MidCap S&P 400 Index Sep Acct | -11.50% | 25.60% | 13.10% | 24.10% | -13.40% | 15.90% | 13.30% | 9.59% | -0.30% | 0.25% |
| Blackrock Mid-Cap Equity Index NL F | -11.12% | 26.15% | 13.63% | 24.70% | -13.08% | 16.40% | 13.85% | 10.08% | 0.05% | 0.04% |
| State Street S&P MidCap Index NL-Cl A | -11.20% | 26.00% | 13.60% | 24.60% | -13.10% | 16.30% | 13.04% | 9.89% | 0.10% | 0.05% |
| Northern Trust S&P MidCap 400 Index Fund- NL- Tier J | -11.09% | 26.18% | 13.65% | 24.74% | -13.07% | 16.42% | 13.90% | 10.10% | 0.04% | 0.10% |

93.     The underperformance of Principal's mid cap index fund was consistent with evidence demonstrating the institutional superiority of Principal's competitors in the field of S&P Midcap 400 index tracking. BlackRock, Northern Trust, and State Street all had more years of experience with mid-cap indexing than Principal during the relevant period. According to data from Morningstar, as of the end of 2024, Principal managed $1.2 billion in

PAGE 34 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

assets tracking the S&P MidCap 400 Index (excluding monies invested by the Principal TDFs), while Northern Trust, BlackRock, and State Street all managed between $3 and $120 billion in products tracking the same index.[14]

94.     Defendants' use of the Principal proprietary small cap index product was similarly imprudent. While few investment managers offer a product that tracks the S&P SmallCap 600 Index, Vanguard began offering such a mutual fund in 2010, and as the chart below shows, it would have been a superior option for participants.

| | Annual Performance for years: | | | | | | | Average Performance | Average Tracking Error | Fee |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | | | |
| S&P SmallCap 600 Index | -9.75% | 20.86% | 9.57% | 25.27% | -17.42% | 13.89% | 8.63% | 7.29% | N/A | 0.00% |
| Principal SmallCap S&P 600 Index Sep Account | -10.20% | 20.20% | 8.90% | 24.60% | -17.90% | 13.30% | 8.45% | 6.76% | -0.30% | 0.21% |
| Vanguard S&P Small Cap 600 | -9.80% | 20.80% | 9.50% | 25.20% | -17.45% | 13.85% | 8.63% | 7.25% | 0.03% | 0.03% |

95.     The chart shows that year after year, the Principal small-cap index option significantly underperformed the Vanguard index fund competitor. The chart further shows that the Principal option had higher tracking error and that the tracking error was chronically negative. Institutional factors also favored Vanguard, given its experience and expertise in index tracking, and given that Vanguard managed at least four times more small-cap-600 index tracking assets as of the end of 2024. Had Defendants been monitoring the performance of the underlying investments in the Principal TDFs and performed a reasonable investigation of marketplace alternatives, consistent with the practice of other similarly situated fiduciaries, they would have replaced the Principal small cap index option with the corresponding Vanguard option.

---

[14] BlackRock and State Street in particular stand out as having achieved superior economies of scale to Principal. As of the end of 2024, according to data from Morningstar, Northern Trust managed $2 billion in assets tracking the S&P MidCap 400 Index, while both BlackRock and State Street managed between $37 to $100 billion in assets tracking this index. Principal had $1.2 billion in assets tracking the S&P MidCap 400 Index.

PAGE 35 – CLASS ACTION ALLEGATION COMPLAINT

96. The fact that Principal's index fund options were annuity separate accounts while the marketplace alternatives were collective investment trusts or mutual funds is not a material distinction. Though the legal structure of the Principal index funds is that of an annuity separate account, the investments themselves did not offer any actual insurance-like features. Defendants used an annuity separate account vehicle because that happens to be the index fund vehicle that Principal offers in the marketplace, not because use of that vehicle conferred any benefit upon Principal TDF participants compared with using an index fund operated as a collective investment trust or mutual fund. This is demonstrated by the fact that Defendants also used proprietary collective investment trust and mutual fund vehicles as holdings within the Principal TDFs.

97. Defendants benefited in multiple ways from the use of proprietary index funds within the Principal TDFs. In addition to the fees earned by Defendants, Principal's TDF assets help subsidize the operating costs of Principal's index funds, making them more profitable to Principal. The impact on Principal's business interests has been substantial: more than half of the assets in Principal's large cap, mid cap, small cap and bond index funds come from the Principal TDFs.

## III. DEFENDANTS INVESTED PRINCIPAL TDF ASSETS IN MORE EXPENSIVE VEHICLES AND SHARE CLASSES DESPITE AVAILABILITY OF IDENTICAL LOWER-COST OPTIONS

98. Defendants breached their ERISA duties by utilizing more expensive versions of Principal-affiliated underlying investments in the TDFs despite the availability of identical, but lower cost, investment vehicles and share classes. This failure directly resulted in higher investment fees earned by Defendants and their affiliates at the expense of participants like

PAGE 36 – CLASS ACTION ALLEGATION COMPLAINT

Plaintiffs, who paid higher fees and experienced worse investment performance as a result of Defendants' imprudence and self-dealing.

99.    As described *supra*, for every investment used by a collective investment trust using a fund-of-funds structure such as the TDFs, a prudent fiduciary will investigate whether the trust can use its size and negotiating power to qualify for otherwise identical lower-cost investment vehicles and share classes.

100.    Defendants failed to investigate and utilize such lower-cost vehicles, in several instances using Principal-affiliated mutual funds as investments within the Principal TDFs despite the availability of lower-cost (but otherwise identical) annuity separate accounts managed by Principal. For example, Principal's MidCap S&P 400 Index mutual fund (PMFMX) has a higher expense ratio than its separate account equivalent, yet the mutual fund has been used within the Target Date Funds despite the availability of the lower-cost option.

101.    Defendants cannot argue there was a qualitative difference between the two vehicles. Defendants' own sales literature represents that they act as an ERISA fiduciary in their management of annuity separate accounts, that substantial resources have gone into the careful review and ongoing monitoring of their annuity separate accounts and that Principal's annuity separate accounts constitute appropriate investments for an ERISA fiduciary. Principal Investment Fiduciary Support Services Brochure at 3.[15]

102.    For example, at all relevant times, the Principal TDFs have used the mutual fund version of the Principal Diversified International Fund when an identical version of this

---

[15] *Terms and Conditions for ERISA 3(21) Serv. for Defined Contribution Plans and Defined Benefit Plans provided by Wilshire*, at 3 (2022), https://secure02.principal.com/publicvsupply/GetFile?fm=pq10986&ty=VOP&EXT=.VOP (last accessed Apr. 13, 2026).

PAGE 37 – CLASS ACTION ALLEGATION COMPLAINT

investment was available as an annuity separate account, which is called the "Z share" version of this fund and which carries lower fees than the mutual fund version.

103. Below is a chart for 2018 to 2024 comparing the performance of the Principal Diversified International mutual fund used by the Principal TDFs with Z shares of the Principal Diversified International annuity separate account. It demonstrates that not only not only did the annuity separate account have lower fees but also had consistently superior performance *on a pre-fee basis*.

| | Annual Performance for years: | | | | | | | Average Performance | Fee |
|---|---|---|---|---|---|---|---|---|---|
| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | | |
| Principal Diversified International Annuity Separate Account - Z shares | -13.12% | 22.34% | 9.87% | 10.65% | -16.76% | 13.45% | 8.92% | 5.05% | 0.39% |
| Principal Diversified International Mutual Fund I Shares | -13.45% | 21.90% | 9.42% | 10.10% | -17.20% | 12.90% | 8.35% | 4.57% | 0.85% |

104. This was not the only instance in which Defendants used higher-cost investments despite the availability of identical, lower-cost vehicles. All of the Principal TDFs used the Principal International Emerging Markets mutual fund, which as of the end of 2024 charged expenses of 1.02% per year. Defendants used this investment despite the availability of Z shares that charged expenses of 0.39% at the end of 2024.

105. The chart below shows, again, how Defendants also used higher-cost, lower-performing mutual fund vehicles for the Short-Term Income, Global Diversified Income and Inflation Protected Securities investments despite the availability of lower-cost but otherwise identical annuity separate account options.

| Mutual Fund Used in Principal LifeTime Hybrid Target Date Funds | Fee | Lower Cost Separate Account | Fee |
|---|---|---|---|
| Principal Short Term Income Fund (PSHIX) | 0.45% | Principal Short-Term Income Separate Account | 0.25% |
| Principal Global Diversified Income Fund (PGDIX) | 0.65% | Principal Global Diversified Income Separate Account | 0.35% |
| Principal Inflation Protection Fund (PIPIX) | 0.50% | Principal Inflation Protection Separate Account | 0.30% |

PAGE 38 – CLASS ACTION ALLEGATION COMPLAINT

106.    These decisions not only resulted in Defendants and their affiliates earning higher fees, but they also benefitted Principal's mutual fund business by helping to subsidize the costs of complying with the Investment Company Act of 1940 and providing superior economies of scale. For example, according to Principal Funds' Statement of Additional Information, as of February 6, 2018, 55.99% of the assets of the Principal Diversified International mutual fund were invested in the Principal TDFs. Assets from the Principal TDFs made the Principal Diversified International mutual fund and other Principal mutual funds more profitable to Defendants and their affiliates.

107.    Defendants also failed to investigate and utilize the lowest-cost share class of many of the investments held by the Principal TDFs. As discussed above, prudent fiduciaries will use their size and negotiating power to qualify for the lowest-cost available share class of an investment vehicle. The lowest-cost share class for Principal's annuity separate account investments is Z shares, and the lowest-cost share class of Principal's mutual funds are R6 shares. Yet Defendants consistently used the I5 share class for annuity separate accounts and Institutional shares for the mutual funds held by the Principal TDFs. For example, Defendants utilized Institutional shares of the Principal High Yield mutual fund, with annual expenses of 0.61%, despite the availability of R6 shares, which cost only 0.53% per year. Similarly, Principal used I5 shares of the large cap, mid cap, and small cap index fund annuity separate accounts despite the I5 shares charging fees that were materially higher than the fees charged by otherwise-identical Z shares.

108.    Investing in these more expensive vehicles or share classes did not confer any benefit upon participants investing in the Principal TDFs. There were no revenue sharing payments that were credited to participants involved here, and though some participating plans

PAGE 39 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

were paid service fee credits, these amounts were nominal and ultimately flowed to the benefit of Defendants and their affiliates, as these fee credits were used to pay recordkeeping fees to Principal.

109.    Plaintiffs did not have knowledge of all material facts (including, among other things, availability of less expensive and better performing alternative investments, the availability of lower-cost investment vehicles and share classes, the relatively greater experience, expertise, and asset base of Principal's competitors in the index fund marketplace, and the investment performance of underlying Principal TDF investments versus other specific alternatives) necessary to understand that Defendants breached their duties in violation of ERISA here until shortly before this suit was filed. Further, Plaintiffs do not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the selection and monitoring of investment options within the Principal TDFs (including Defendants' processes and motivations for selecting, monitoring, evaluating, and removing investments) because this information is solely within Defendants' possession prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth in this Complaint.

## IV.    DEFENDANTS VIOLATED ERISA BY CHARGING PLAINTIFFS AND THE PLAN EXCESSIVE RECORDKEEPING FEES.

110.    In addition to the other Principal Defendants here, Principal Life is an ERISA fiduciary pursuant to 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority or discretionary control over the Plan and its assets and is also a party in interest as defined in ERISA.  *See* 29 U.S.C. § 1002(14). As fiduciaries to the Plan and parties in interest subject to ERISA's prohibited transaction rules, Principal Life was at all material times obligated to act

PAGE 40 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

prudently and solely in the interest of the Plan participants to ensure that Plan fees and expenses are reasonable.

111.    The marketplace for retirement plan recordkeeping services is well established and highly competitive. As a large retirement plan, the Plan had tremendous bargaining power to demand low-cost administrative and investment management services, facts of which Principal Life was well aware as the recordkeeper for the Plan.

112.    As fiduciary and party-in-interest to the Plan, Principal Life was obligated to limit the Plan's recordkeeping expenses to a reasonable amount.

113.    Instead of leveraging the Plan's substantial bargaining power to limit the Plan's recordkeeping expenses, Principal Life imprudently placed its financial interests ahead of the interests of Plaintiffs and other Plan participants by using itself to handle the Plan's recordkeeping instead of a less expensive vendor, causing Plaintiffs and other Plan participants to pay higher fees than they would have paid for recordkeeping had the Plan instead employed one of Principal Life's competitors as recordkeeper here.

114.    Defendants breached their fiduciary duties of prudence and loyalty owed to the Plan and to Plaintiffs and committed party-in-interest transactions prohibited by ERISA by charging unreasonable recordkeeping and administrative expenses to the Plan and by failing to investigate other, more prudent alternative recordkeeping providers when such providers were readily available throughout the proposed Class Period here.

115.    Plaintiffs were injured because Defendants permitted all Plan participants to be charged excessive recordkeeping and administrative expense fees, which benefited Defendants but reduced Plaintiffs' and other Plan participants' account balances and caused them significantly diminished investment returns.

PAGE 41 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

A.      **Plan Administrative Services In The Defined Contribution Plan Industry.**

116.    In recent decades, the defined contribution plan has become the most common type of employer-sponsored retirement plan.

117.    Each participant in a defined contribution plan has an individual account and directs their plan contributions into one or more investment options in a lineup chosen by the plan's fiduciaries. "[P]articipants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 843 F.3d at 1191.

118.    The majority of fees assessed to participants in a defined contribution plan are attributable to two general categories of services: plan administration (including recordkeeping), and investment management. These expenses "can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id.*

119.    The plan's fiduciaries (Defendants among them) have control over these expenses. The fiduciaries are responsible for hiring administrative service providers, such as a recordkeeper, and negotiating and approving those service providers' compensation. The fiduciaries also have exclusive control over the menu of investment options to which participants may direct the assets in their accounts. Those selections each have their own fees which are deducted from the returns that participants receive on their investments.

120.    These fiduciary decisions have the potential to dramatically affect the amount of money that participants are able to save for retirement. According to the DOL, a 1% difference in fees over the course of a 35-year career makes a difference of *28%* in savings at retirement.[16]

---

[16] *See* U.S. Dep't of Labor, *A Look at 401(K) Plan Fees*, , Employee Benefits Sec. Admin. (EBSA), at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf .

PAGE 42 – CLASS ACTION ALLEGATION COMPLAINT

Accordingly, fiduciaries of defined contribution plans must engage in a rigorous process to control these costs and ensure that participants pay no more than a reasonable level of fees. This is particularly true for large plans like the Plan, which have the bargaining power to obtain the highest level of service and the lowest fees. The fees available to large retirement plans are orders of magnitude lower than the much higher retail fees available to small investors.

121.    The entities that provide services to defined contribution plans have an incentive to maximize their fees by putting their own higher-cost funds in their client plans (as happened here) and collecting the highest amount possible for recordkeeping. For each additional dollar in fees paid to a service provider, retirement plan participants' retirement savings are directly reduced by the same amount, and participants lose the potential for those lost assets to grow over the remainder of their careers. Accordingly, participants' retirement security is directly affected by the diligence used by plan fiduciaries to control, negotiate, and reduce the plan's fees.

122.    Fiduciaries must be cognizant of providers' self-interest in maximizing fees and not simply accede to the providers' preferred investment lineup—*i.e.*, proprietary funds that will generate substantial fee revenue for the provider—or agree to the provider's administrative fee quotes without negotiating or considering alternatives. In order to act in the exclusive interest of participants and not in the service providers' interest, retirement plan fiduciaries like Defendants must negotiate as if their own money was at stake. Instead of simply accepting the investment funds or fees demanded by these conflicted providers, fiduciaries must consider whether participants would be better served by using alternative investment products or services.

123.    The potential for imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently

PAGE 43 – CLASS ACTION ALLEGATION COMPLAINT

capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits are limited to the value of their own investment accounts, which is determined by the market performance of contributions less expenses. Thus, in a defined contribution plan, risks related to high fees and poorly performing investments are borne by the participant.

124.    The table below illustrates how retirement plan service fees impact retirement accounts over time.[17] The table illustrates that when an employee invests $100,000 over 20 years with an assumed 4% annual rate of return and annual fees of 1.00%, the account balance in 20 years will be $180,000. This balance is $30,000 less than the same investment where annual fees are only 0.25%, which would result in a balance of $210,000. This difference of over 14 percent is substantial. In fact, the impact of excessive fees on defined contribution participants is even more substantial given that during most of the past three decades the returns of defined contribution participants have averaged almost double (7%) the 4% in the below SEC example.[18]

---

[17] *See Mutual Fund Fees and Expenses*, SEC Office of Inv. Educ. and Advoc. (SEC Pub. No. 162 (5/14), https://www.sec.gov/files/ib_mutualfundfees.pdf .

[18] *See, e.g.*, Net Weighted Geometric Rate of Return of Defined Contribution Plans from 1990-2012 as calculated by the Center for Retirement Research at Boston College, *Investment Returns: Defined Benefit vs. Defined Contribution Plans*, at 3, Table 4 (Dec. 2015, Number 15-21), https://crr.bc.edu/wp-content/uploads/2015/12/IB_15-211.pdf .

PAGE 44 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840



Portfolio Value From Investing $100,000 Over 20 Years

In 20 years, 0.50% annual fees reduce portolio value (red line) by $10,000 compared to a portfolio with a 0.25% annual fee (blue line).

In 20 years, 1.00% annual fees reduce portfolio value (green line) by nearly $30,000, compared to a portfolio with a 0.25% annual fee (blue line).

— 4% annual return less 0.25% annual fee

— 4% annual return less 0.50% annual fee

— 4% annual return less 1.00% annual fee

### B.    Recordkeeping.

125.    "Recordkeeping" is a catchall term for the entire suite of recordkeeping and related administrative services typically provided by a plan's service provider or "recordkeeper."

126.    There are two types of essential recordkeeping and related administrative services provided by all national retirement plan recordkeepers. For large plans with substantial bargaining power like the Plan, the first type is provided as part of a "bundled" fee for a buffet-style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

　　　　a.    Recordkeeping;

　　　　b.    Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

　　　　c.    Administrative services related to converting a plan from one recordkeeper to another;

　　　　d.    Participant communications and support (including employee meetings, call centers/phone support, voice response systems, web account access,

PAGE 45 – CLASS ACTION ALLEGATION COMPLAINT

and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

e.    Maintenance of an employer stock fund (if needed);

f.    Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.    Plan consulting services, including assistance in selecting the investment lineup offered to participants;

h.    Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s (excluding the separate fee charged by an independent third-party auditor);

i.    Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm);

j.    Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules; and

k.    Directed Trustee and Custodial Services.

127.    This suite of essential recordkeeping services can be referred to as "Bundled Recordkeeping" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, their bids and their contracts, understands and appreciates that the services chosen by a large defined contribution retirement plan do not affect the amount charged by recordkeepers for such basic and fungible services, and any claim that recordkeeping expenses depend upon the service level provided to a plan with respect to the above services is false. Nonetheless, as is all too often the case, when

PAGE 46 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

attempting to defend their malfeasance or nonfeasance with respect to recordkeeping fees, ERISA fiduciary-defendants often assert that the cost of Bundled Recordkeeping services depends upon service level as part of an attempt to perpetuate misunderstanding by the less informed in order to stave off breach of fiduciary duty claims, even though such an assertion is plainly untrue based upon the actual marketplace for such services. Like other national recordkeeping providers, Principal Life here offers a "bundled services program."

128.    The second type of essential recordkeeping services provided by all national recordkeepers can be referred to as "A La Carte" recordkeeping services and often has separate, additional fees based on the conduct of individual retirement plan participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These services typically include the following:

    a.    Loan processing;

    b.    Brokerage services/account maintenance (if offered by the plan);

    c.    Distribution services; and

    d.    Processing of qualified domestic relations orders.

129.    All national retirement plan recordkeepers have the capability to provide all of the aforementioned Bundled and A La Carte services to all large defined contribution plans, including the Plan itself and those much smaller than the Plan.

130.    For large plans with more than 5,000 participants, like the Plan, any minor variations in the way that these essential services are delivered have no material impact on the fees charged by recordkeepers to deliver the services.

PAGE 47 – CLASS ACTION ALLEGATION COMPLAINT

131.    Minor variations in the way the services are delivered by different recordkeepers is immaterial to the fees charged by recordkeepers. This is confirmed by the practice of all recordkeeping service providers to quote fees for the Bundled Recordkeeping services on a per-participant basis, without regard for any variation in the usage of the Bundled Recordkeeping services—which are treated by the service providers as largely immaterial because they are, in fact, inconsequential to recordkeepers from a cost perspective.

132.    Recordkeeping services are necessary for every defined contribution plan. Fiduciaries of virtually all large defined contribution plans hire one recordkeeper to provide the essential recordkeeping and administrative services for a plan. These services are largely commodities, and the market for recordkeeping services is highly competitive.

133.    Since the mid-2000s, the retirement plan services provided to large defined contribution plans like the Plan have increasingly become viewed by prudent plan fiduciaries as a commodity service. While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, most recordkeepers offer the same combinations of services as their competitors. As a result, the market for defined contribution retirement plan services is highly competitive, particularly for large plans that (like the Plan) have tens of thousands of participants and more than a billion dollars' worth of assets under management.

134.    In recent decades, the fee that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased. Large recordkeepers view recordkeeping and administration as an opportunity to generate additional revenue through proprietary investment management, managed accounts, IRA rollovers and cross-selling retail financial products related to retirement investing.

PAGE 48 – CLASS ACTION ALLEGATION COMPLAINT

135.    Recordkeepers for larger defined contribution plans like the Plan have advantages that lead to a reduction in the per-participant cost as the number of participants in the plan increases. This is because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants in a defined contribution plan increase, the recordkeeper can spread the cost of providing retirement plan services over a larger participant base, reducing the average unit cost of delivering services on a per-participant basis.

136.    Moreover, the cost to a recordkeeper to provide services to a participant does not materially differ from one participant to another and is not dependent on the balance of the participant's account. The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. In other words, the average cost to provide recordkeeping and administrative services to a plan for a given participant is materially identical whether that participant has an average account balance of $10,000 or $100,000.

137.    Therefore, large plans like the Plan in this case possess tremendous economies of scale for recordkeeping and administrative services and wield enormous market power to insist upon the lowest level of fees for materially identical recordkeeping and administrative services. As the number of participants in the plan increases, the cost per participant to deliver the recordkeeping and administrative services decreases. Prudent plan fiduciaries and their consultants and advisors are aware of this cost structure dynamic for retirement plan providers.

PAGE 49 – CLASS ACTION ALLEGATION COMPLAINT

## VII.    PRUDENT FIDUCIARY STANDARDS OF SELECTING AND MONITORING RECORDKEEPERS

138.    Plan fiduciaries are required to fully understand all sources of revenue paid to recordkeepers. Fiduciaries must regularly monitor the revenue paid to recordkeepers to ensure that the compensation received is and remains reasonable in view of the services provided.

139.    The DOL has identified that plan fiduciaries are held to a "high standard of care and diligence" and must, among other duties, "[e]stablish a prudent process for selecting . . . service providers"; "[e]nsure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided"; and "[m]onitor . . . service providers once selected to make sure they continue to be appropriate choices."[19]

140.    The duty to evaluate and monitor plan service provider fees includes those fees directly paid by participants, because "[a]ny costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants."[20]

141.    Prudent fiduciaries will ensure that a plan is paying reasonable recordkeeping and administrative services fees by soliciting competitive bids from other recordkeepers to perform the same services currently provided to the plan. This process is not difficult or complex and is performed regularly by prudent plan fiduciaries. For plans with many participants, like the Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote for fees, while others might only require the number of participants.

---

[19] *See A Look at 401(k) Plan Fees*, at 2, *supra*.
[20] *The Economics of Providing 401(k) Plans: Service, Fees, and Expenses*, 2018, Investment Company Institute, at 7 (July 2019), https://www.ici.org/pdf/per24-04.pdf .

PAGE 50 – CLASS ACTION ALLEGATION COMPLAINT

142.    Prudent fiduciaries have all of this information readily available and can easily receive a quote from other recordkeepers to determine if the current level of fees charged to the plan is reasonable.

143.    Having received competing bids, a prudent fiduciary can negotiate with its current provider for a lower fee or move to a new recordkeeper to provide the same services for a competitive (or lower) reasonable fee. Prudent fiduciaries follow this same process on a regular basis to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

144.    After the revenue requirement is negotiated, the plan fiduciaries determine how to pay the negotiated recordkeeping and administrative services fees. The employer/plan sponsor can pay the fees on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeping provider would accept. Typically, however, the employer decides to have the plan (*i.e.*, participants) pay the recordkeeping and administrative fees. If the fees are paid by participants, the fiduciaries can allocate the negotiated fees among participant accounts at the negotiated per-participant rate, or pro rata based on account values, among other less common ways.

145.    In other words, if a plan negotiates a per-participant revenue threshold, *e.g.*, $40.00, the plan does not need to require that each participant pay $40.00. Rather, the fiduciaries could determine that an asset-based fee is more appropriate for participants and allocate the fees pro rata to participants. For example, a 10,000-participant plan with a $40.00 revenue threshold would pay $400,000 in fees. If the Plan had $400,000,000 in assets, then the $400,000 would

PAGE 51 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

work out to 10 basis points. Accordingly, the Plan could allocate the $400,000 in fees to participants by requiring that each participant pay 10 basis points.

146. Because revenue sharing arrangements provide indirect, asset-based compensation for the recordkeeper—recordkeeping expense calculated as a percentage of total plan assets—prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable based upon the services provided. A prudent fiduciary must ensure that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable, negotiated recordkeeping fee.

147. In such an asset-based pricing structure, since the amount of compensation received by the recordkeeper is based on a percentage of the total assets in the plan, this structure creates situations in which the services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases.

148. Moreover, because revenue sharing payments are asset based, they bear no relation to the actual cost of providing reasonable recordkeeping and administrative services and can result in payment of unreasonable fees.

149. By 2013, prior to the Class Period, the impact of the 2012 Fee Disclosure regulations was incorporated into the standard of care and was well known, understood, and established among prudent plan fiduciaries based on the DOL guidelines, case law, and best practices as shared by retirement plan professionals. For example, in its 2013 publication titled *DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC summarized the standard of care exercised by prudent retirement plan professionals and plan fiduciaries as follows:

 PAGE 52 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

1. Price administrative fees on a per-participant basis.

2. Benchmark and negotiate recordkeeping and investment fees separately.

3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.

4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.

5. Negotiate vendor contracts to ensure that service standards and liability provisions are in the best interests of plan participants and beneficiaries.

6. Monitor actual fees paid against contractual requirements.

7. Review services annually to identify opportunities to reduce administrative costs.[21]

150. If an ERISA fiduciary decides to use revenue sharing to pay for recordkeeping, prudent fiduciaries: (a) determine and monitor the amount of the revenue sharing and any other sources of compensation that the provider has received, (b) compare that amount to the price that would be available on a flat per-participant basis, and (c) control the amount of fees paid through recordkeeping by obtaining rebates of any revenue sharing amounts that exceed the reasonable level of fees.

151. First, ERISA fiduciaries must pay close attention to the recordkeeping and administrative services fees paid by the plan. A prudent fiduciary monitors the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses and multi-practice and standalone pricing reports. This

---

[21] *DC Fee Mgmt. — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC, at 3–4 (2013), https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf.

PAGE 53 – CLASS ACTION ALLEGATION COMPLAINT

would include information from all revenue, not just retirement plan services revenue, generated by providers through their relationship with the plan.

152.    To make an informed evaluation as to whether a recordkeeper is receiving a reasonable fee for the services provided to the plan, a prudent fiduciary must identify all fees, including direct compensation and indirect revenue sharing, paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries must monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels.

153.    Second, in determining the price that would be available for recordkeeping and administrative services on a flat per-participant basis, prudent fiduciaries making such an assessment for a large plan recognize that it is necessary to solicit bids from competing retirement plan recordkeeping service providers. In large retirement plans with thousands of participants such as the Plan, benchmarking based on fee surveys alone is inadequate. Recordkeeping fees for large plans have declined significantly in recent years due to increased technological efficiency, competition and increased attention to fees by sponsors of other plans such that fees that may have been reasonable at one time may have become excessive based on current market conditions. Accordingly, the only way to determine the true market price at a given time is to obtain a competitive bid. *See Sacerdote v. N.Y. Univ.*, No. 16-cv-6284 (KBF), 2017 U.S. Dist. LEXIS 137115, at *25-26 (S.D.N.Y. Aug. 25, 2017) ("there are circumstances where a failure to run a competitive bidding process may be imprudent"), *aff'd in part, vacated in part, and remanded,* 9 F.4th 95 (2d Cir. 2021); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) ("a trier of fact could reasonably conclude that defendants did not

PAGE 54 – CLASS ACTION ALLEGATION COMPLAINT

satisfy their duty to ensure that [recordkeeper's] fees were reasonable" where plan fiduciaries failed to solicit competitive bidding for more than fifteen years).

154.    Best practices in retirement plan management dictate that conducting a competitive bidding process, called a request for proposal ("RFP"), must be done at reasonable intervals but at least once every three to five years. However, plan fiduciaries can quickly and easily gain an understanding of the current market for materially identical retirement plan services and determine a starting point for negotiation without a formal RFP by merely soliciting bids from other recordkeepers. Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process, be it formal or informal, that provides an incentive to recordkeepers to provide a competitive bid.

155.    Third, a prudent ERISA fiduciary must require that any recordkeeping-related revenue-sharing payments that exceed a reasonable level be returned to the plan and its participants.

156.    All of these standards are accepted and understood by prudent plan fiduciaries and were, or should have been, understood by Defendants at all times during the Class Period. This is because prudent fiduciaries understand that excessive fees significantly impact the value of participants' retirement accounts.

## VIII.    DEFENDANTS BREACHED THEIR ERISA FIDICIARY DUTIES TO THE PLAN.

### A.    Defendants Imprudently Permitted The Plan To Pay Excessive And Unreasonable Recordkeeping And Administrative Fees.

157.    Here Defendant Principal Life is the Plan's administrative services provider and recordkeeper. Upon information and belief, Principal Life is the Plan's recordkeeper primarily because it is a corporate affiliate of the other Principal Defendants here, who supply most of the Plan's investment management services, and not because it was chosen for the Plan by Defendants in an RFP-type setting

PAGE 55 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

where Principal Life was selected by the Plan's fiduciaries to become the Plan's recordkeeper because Principal Life quoted the Plan lower per-participant recordkeeping fees than, say, competitor recordkeeping firms like Fidelity Investments and Vanguard did in their RFP responses to the Plan's fiduciaries.

158.    There are no regulations that require retirement plan recordkeepers to publicly disclose the recordkeeping fees they negotiate with 401(k) plan sponsors and fiduciaries. Instead, recordkeepers are only required to disclose their fees to the plans that they have agreements with under § 408(b)(2) of ERISA, commonly known as the "408(b)(2) Regulation."

159.    The required 408(b)(2) disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement. A plan's participants (and the general public) do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation.

160.    Accordingly, the Form 5500s filed with the DOL are the only means for the general public, or plan participants, to obtain information about the recordkeeping fees paid by plans outside of the plan participants' own plan. These Form 5500s do not include descriptions of the services provided by the recordkeepers.

161.    In the most recent publicly available Form 5500 filing for the Plan (from Plan year 2023), participants were told as follows concerning their recordkeeping fees:

PAGE 56 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

## B. Participant Accounts

Each Participant's account is credited with an allocation of the employer's contributions and Plan earnings. A Participant's account is reduced by general administration, recordkeeping, investment management fees and commission charges. Commission charges reduce the investment returns by a fraction of a percentage and these charges are not reflected on the Participant's account. The Participant statement only indicates the net return and the benefit to which a Participant is entitled as the benefit that can be provided from the Participant's account. Effective December 1, 2021, the participant fee decreased from $55 per year to $48 per year. An additional administrative expense is annually deducted from each Participant's account equal to 0.05% of their account balance, which remained unchanged in 2023 and 2022. 1/12th of the fees are deducted monthly. Assessed fees for the years ended March 31, 2023 and 2022 total approximately $2,023,000 and $2,336,000 respectively.

162.    In other words, Plan participants like Plaintiffs during the year preceding this Form 5500 filing (which would be around the middle of the proposed class period in this matter) paid $48 per participant per year plus 0.05% of their account balance per participant per year in recordkeeping fees. In 2022, once the 0.05% fee is input, Plaintiffs and other participants in the Plan paid an effective recordkeeping fee of $93.73/participant (based on 24,923 participants in the Plan for that reporting period). Based on the Form 5500 filings, for 2023 the effective recordkeeping fee factoring in the 0.05% account balance element was $80/participant (based on 25,273 participants in the Plan for that reporting period). Such per-participant recordkeeping fees are extremely high for a plan with over $1 billion in assets like the Plan.

163.    The Plan's fees were excessive and unreasonable compared to other defined contribution plans of comparable size on a per-participant basis. The DOL encourages plan sponsors to "[c]ompare the information you receive, *including fees and expenses to be charged by the various providers for similar services*."[22] Although the DOL notes that cost is only one

---

[22]*See* U.S. Dep't of Labor, *Getting It Right Know Your Fiduciary Responsibilities*, ¶ 5, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (emphasis added).

PAGE 57 – CLASS ACTION ALLEGATION COMPLAINT

factor to be considered when selecting a recordkeeper, and a plan sponsor is not required to pick the least costly provider, "the law . . . does require that fees charged to a plan be 'reasonable.'"[23]

164.    Given the Plan's size and negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain recordkeeping and administrative services for significantly lower rates than the above per-participant amounts had the Plan been managed by unconflicted and prudent ERISA fiduciaries rather than Defendants—who at all material times had strong economic incentives (and effective ones, as it happens) to choose Principal Life as the Plan's recordkeeper and retain Principal Life in this role at inflated prices during a time period when recordkeeping fees for comparably situated large defined contribution retirement plans were falling.

165.    A reasonable rate for Principal Life's recordkeeping services based on what other similar plans paid other national retirement services providers for the same or superior services would have been around $40 per participant per year during the proposed class period. Had Defendants followed the guidance of the DOL, they could have easily determined it was not reasonable for the Plan to pay average recordkeeping and administrative fees to Principal Life of $80 per participant per year or more for the last few discussed years, by way of example.

166.    Because the level of fees that recordkeepers have been willing to accept for providing retirement plan services, including recordkeeping and administrative services, has stabilized and has not materially changed during the proposed class period, reasonable recordkeeping and administrative fees paid in 2019 (shortly before the beginning of the proposed class period in this matter, in other words) and moving forward temporally are representative of

---

[23] *See* U.S. Dep't of Labor, *Meeting Your Fiduciary Responsibilities*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

PAGE 58 – CLASS ACTION ALLEGATION COMPLAINT

the reasonable fees for retirement plan recordkeeping services for retirement plans like the Plan during the entire proposed class period. The table below illustrates a comparison of the annual per-participant recordkeeping and administrative services fees paid by other comparable plans in contrast to that paid by the Plan. The plans provide a reasonable benchmark to the Plan, yet they paid total fees (direct and indirect) that were far lower than the all-in fees paid by the Plan on a per-participant basis to Principal Life for recordkeeping services:

| Plan Year | Plan Name | Plan Assets | # Participants | Recordkeeping Fee/Participant |
|---|---|---|---|---|
| 2019 | The Rite Aid 401(k) Plan | $2,668,142,111 | 31,330 | $30 |
| 2019 | The Dow Chemical Company Employees' Savings Plan | $10,913,979,302 | 37,868 | $25 |
| 2019 | The Savings and Investment Plan [WPP Group] | $3,346,932,005 | 35,927 | $27 |
| 2020 | Vanguard Retirement and Savings Plan | $8,185,182,391 | 22,485 | $12.05 |
| 2021 | BlackRock Retirement Savings Plan | $3,828,146,761 | 12,996 | $2.50 |
| 2022 | Philips North America 401(k) Plan | $5,170,841,621 | 30,811 | $23 |
| 2022 | The Cargill Partnership Plan | $7,721,733,222 | 44,511 | $15.11 |
| 2022 | Cardinal Health 401(k) Savings Plan[24] | $ 3,710,611,908 | 36,294 | $41.04 |
| 2022 | **IBEW District 9 Pension Plan  (The Plan)** | **$1,942,050,992** | **24,923** | **$93.73** |
| 2023 | Cardinal Health 401(k) Savings Plan | $4,284,272,052 | 35,420 | $25.18 |
| 2023 | Deseret 401(k) Plan | $4,659,316,663 | 37,570 | $20 |
| 2023 | Humana Retirement Savings Plan | $7,374,468,546 | 61,177 | $46.85 |
| 2023 | **IBEW District 9 Pension Plan  (The Plan)** | **$2,338,151,300** | **25,273** | **$80** |
| 2024 | Conagra Brands Retirement Income Savings Plan | $1,468,245,763 | 14,512 | $36 |
| 2024 | Relx Inc. US Salary Investment Plan | $4,110,132,695 | 19,122 | $25 |
| 2024 | Tyson Foods, Inc., 401(k) Plan | $3,729,265,447 | 63,329 | $36.31 |
| 2024 | U.S. Roche 401(k) Savings Plan | $14,347,809,529 | 35,337 | $38.41 |

---

[24]   For the plan accounting years of 2022 and 2023, the Cardinal Health 401(k) Savings plan employed Principal Life as recordkeeper.

PAGE 59 – CLASS ACTION ALLEGATION COMPLAINT

| 2024 | IBEW District 9 Pension Plan (The Plan) | $2,324,210,091[25] | 25,269 | $93.99[26] |
|------|------|------|------|------|

167.    The table above is an apples-to-apples comparison of total cost (both direct and indirect fees) and per-participant cost between the Plan and the other plans using national retirement plan service providers like Principal Life.

168.    As stated above, based on information and belief, Defendants employed Principal Life as Plan recordkeeper and retained it in that role and failed to conduct competitive bidding for recordkeeping providers other than Principal Life during the proposed class period because Principal Life is a corporate affiliate of the other Principal Defendants here. Due to the inherent conflict and lack of arms' length bargaining occasioned by those corporate relationships, Defendants caused the Plan to overpay for Principal Life's recordkeeping services compared to other plans with comparable numbers of participants and assets under management.  Courts in similar ERISA cases have found allegations like these concerning excessive defined contribution retirement plan-related recordkeeping fees against Principal Life sufficiently substantial to withstand motions to dismiss for failure to state a claim.  *See, e.g., Davis v. Magna Int'l of Am., Inc.*, 2021 U.S. Dist. LEXIS 62106, at *28–29 (E.D. Mich. Mar. 31, 2021) (denying motion to dismiss by Principal Life and other plan fiduciaries).[27]

---

[25] Assets and participants as of March 31, 2024 Form 5500.

[26] According to the Plan's March 31, 2025 Plan Form 5500 audit, the per participant fee is "$48 per year. An additional administrative expense is annually deducted from each Participant's account equal to 0.05% of their account balance, which remained unchanged in 2025."

[27] The *Magna* court noted that "Plaintiffs' factual allegations share a distinction recognized by other courts in considering whether the plaintiffs have plead sufficient allegations to plausibly state a claim for breach of prudence. The Plan's investment consultant was Principal Financial, the recordkeeper was also Principal Financial, and the trustee was Principal Trust, and Plaintiffs allege upon information and belief that 'the recordkeeper and trustee are both affiliates of Principal.' []  Out of the 20 funds offered by the Plan, 17 of them bear Principal's name. []Plaintiffs allege that such a structure 'is rife with potential conflicts of interest because

PAGE 60 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600  FAX (503) 227-6840

169. The validity of Plaintiff's comparisons above was confirmed by retirement consulting group NEPC[28] in its 2025 Defined Contribution Plan Trends and Fee Survey Webinar, which surveyed various defined contribution plan fees as of the webinar date of February 17, 2026. https://www.nepc.com/wp-content/uploads/2026/02/2025-NEPC-DC-Plan-Trends-Report.pdf. The webinar discussed NEPC's annual "Defined Contribution Plan Trends & Fees Survey," which examines current plan investment trends, features, and innovations across major sectors and how these plans have evolved over the years.  The median plan surveyed there had $343 million in assets and 3,265 participants. *Id*. at 2. The 2025 NEPC survey found that the range of total recordkeeping fees for plans with between 25,000 and 50,000 participants was between $20 and $40 per participant. *Id*. at 4.

170. The NEPC Survey establishes a reasonable benchmark for retirement plan services fees for the Plan—a reasonable fee for retirement plan services for the Plan would have been at most $40 per participant per the NEPC Survey, not the more-than-$80 per participant paid by Plaintiffs and other investors in the Plan in its recent plan years.

---

Principal and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.' [] Courts have taken similar allegations into account when determining whether other claims, for example share class claims, were enough to plausibly state a claim for the breach of the duty of prudence" under ERISA.  *Id*. at *10 (internal citations omitted).

[28] The NEPC is "a full-service investment consulting firm" with "400+ Clients serviced" including governments, institutions, defined contribution plan sponsors, families and individuals" that has been in business over 38 years. *See* https://www.nepc.com/ (last accessed Apr. 13, 2026).

PAGE 61 – CLASS ACTION ALLEGATION COMPLAINT

**B.**    **The nature and quality of principal life's recordkeeping services did not justify allowing the plan to pay twice the reasonable fee for recordkeeping services.**

**1.**    **All Comparable Recordkeepers Offered the Same Services as Principal Life.**

171.    Defendants may here argue that Plaintiffs have failed to allege the nature and quality of the services provided by the comparable recordkeepers discussed above was the same as the nature and quality of the services provided by Principal Life to Plaintiffs and the Plan.

172.    During the proposed class period here and based on ERISA's statutory requirements, the annual Plan disclosures, Principal Life's website, Plaintiffs' personal experience as Plan participants and other publicly available information, Plaintiffs have identified recordkeeping services that Principal Life provided to the Plan:

173.    Principal Life provided among others the following recordkeeping services to the Plan:

   a.    Recordkeeping:

   - Establish and Maintain Plan participant accounts.

   - Maintain and update Plan participant data; and

   - Track Plan participant contributions, earnings and investments.

   b.    Transaction Processing:

   - Execute trades and transaction processing (buying and selling plan investments) requested by Plan participants; and

   - Process employee enrollment and Plan participant payroll contributions.

   c.    Participant Communications:

PAGE 62 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

- Allow Plan participants to access their accounts through the Plan websites and mobile applications;

- Generate and send quarterly account statements to Plan participants;

- Generate and send Plan participant communications, including Section 404(a)(5) Plan investment option disclosures, and periodic participant newsletters;

- Make retirement and financial education and planning services available on the Plan website;

- Make financial planning tools such as retirement income calculators available;

- Make a telephone call center or voice response unit (VRU) available to answer questions or give assistance to Plan participants;

- Conduct periodic informational and enrollment meetings with employees and Plan participants;

- Process Plan participant distributions and issue checks; and

- Quarterly Plan management reporting.

d. Plan document services:

- Make updates to the Plan Documents to maintain compliance with ERISA, the Internal Revenue Code, and other relevant regulations.

e. Plan consulting services:

- Plan design consulting, including information about the different plan design options.

PAGE 63 – CLASS ACTION ALLEGATION COMPLAINT

f.  Accounting and audit services:

- Prepare filings and disclosures, including the summary plan description and Form 5500s.

g.  Compliance support and testing services:

- Regulatory and Compliance consulting related to regulatory compliance with ERISA, the Internal Revenue Code and relevant regulations; and

- Compliance testing support.

174.    None of the aforementioned services provided to the Plan by Principal Life as recordkeeper to the Plan are unique or even uncommon in the marketplace, and any of those services would be readily available through any other reputable recordkeeper. Fidelity, Vanguard, Wells Fargo, T. Rowe Price, Voya and Transamerica all offered the same (or more) services of the same or higher quality to the comparator plans but did so for less in recordkeeping fees.

175.    All major retirement plan recordkeepers provide the same set of services to large plans with several thousand participants with no material pricing impact regardless of any differences in level of usage from one plan to another. For example, the participants in one plan may call into the call-center more frequently than the participants in another plan. Any differences between the usage levels by the two plans would not result in any changes to the pricing because recordkeepers use internal pricing models that assume average usage rates for all new prospects and accommodate a wide range of actual usage with no impact to the fees.

176.    Principal Life provided the same services that were provided by the other recordkeepers regardless of any differences in the service or compensation codes contained in the Plan's Form 5500 or in the Form 5500s of the comparable plans.

PAGE 64 – CLASS ACTION ALLEGATION COMPLAINT

## 2.    All Comparable Recordkeepers Offered The Same Or Superior Level Of Services To Plans As Principal Life.

177.    Most recordkeeping functions are automated, so there is little difference between the functionality of the various recordkeeping platforms. All 401(k) plan recordkeeping systems must carry out all of the compliance, administration of accounts and investment allocation in precisely the same manner with the same level of accuracy and completeness. Participant account tracking, statements and regulatory notices are virtually identical among all recordkeepers.

178.    Because recordkeeping services are a commodity and all major recordkeepers offer a similar bundle of services to defined contribution plan sponsors, large recordkeepers such as Fidelity, Vanguard and T. Rowe Price attempt to differentiate themselves by their expertise and quality of service, as opposed to the services they actually provide. T. Rowe Price touts its "40+ years of retirement services experience"; "Services provided to more than 2 million employees in 7,500+ plans"; and an "[a]verage client tenure of 14 years and 96% client retention rate." Vanguard claims it is "#1 in overall recordkeeping satisfaction" and the "#1 manager of defined contribution assets." Fidelity claims it is the "No. 1 401(k) provider, helping you attract and retain top talent" with a "99% retention rate." Each major recordkeeper promises to "customize" its recordkeeping platform for individual 401(k) plan clients. [29]

---

[29] The level and quality of services provided are factual questions that cannot be determined at the pleading stage. *See, e.g.*, *Kong et. al. v. Trader Joe's Co.*, No. 20-56415, 2022 U.S. App. LEXIS 10323, at *3 (9th Cir. Apr. 15, 2022) ("Defendants' explanation for the more expensive choice is unavailing at the pleading stage."); *Carrigan v. Xerox Corp.*, No. 3:21-CV-1085 (SVN), 2022 U.S. Dist. LEXIS 70428, at *24 (D. Conn. Apr. 18, 2022) ("Plaintiffs' general allegations that the comparator recordkeepers would have provided services 'of like or superior quality' to the affiliated recordkeepers, as well as Plaintiffs' suggestion that recordkeeping services are fairly standardized, support their claim that the fees charged by the affiliated recordkeepers were excessive."); *Khan v. Bd. of Dirs. of Pentegra Defined Contribution Plan*, No. 20-CV-07561 (PMH), 2022 U.S. Dist. LEXIS 52593, at *18 (S.D.N.Y. Mar. 23, 2022) ("Court cannot conclude

PAGE 65 – CLASS ACTION ALLEGATION COMPLAINT

179.    There may be minor variations in the level of certain services provided to plans by recordkeepers, such as the number of in-person meetings held between the recordkeeper and the plan participants or whether special projects may be included in the recordkeeping agreement with no additional charge. However, these variations in the service model do not materially impact the cost or quality of the services provided.[30] Indeed, since the NEPC Report was a broad based survey, it reflects that to the extent there were any differences in the level of services provided by the recordkeepers in its Report, those differences had no material impact on the per-participant price for the bundled services.

180.    As a result, it is plausible to infer that Fidelity, Vanguard, T. Rowe Price, Wells Fargo and Transamerica all provided the same or superior services to the comparator plans as those provided by Principal Life to the Plan.

## CLASS ACTION ALLEGATIONS

181.    29 U.S.C. § 1132(a)(2) authorizes any ERISA plan participant or beneficiary to bring an action to obtain the remedies provided by 29 U.S.C. § 1109(a). Plaintiffs seek certification of this action as a class action pursuant to this statutory provision and Fed. R. Civ. P. 23.

182.    Plaintiffs assert their claims on behalf of two classes of participants and beneficiaries defined as follows:

---

that the pleading contains insufficient benchmarks for a meaningful comparison of fees at this stage of the proceedings, where such a conclusion evidently requires the Court to resolve fact disputes.").

[30] In fact, as illustrated below with respect to Fidelity, because all recordkeepers claim that their service level is "superior," plan fiduciaries following the prudent standard of care can negotiate to require each recordkeeper's fee to be materially similar and then determine if any perceived level of service is worth paying the small fee differential that recordkeepers will bid in a competitive process to win or retain the business.

PAGE 66 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

a. **TDF/ERISA Prohibited Transactions Nationwide Class**:     All participants and beneficiaries of any employee benefit plan qualified under Section 401(a) of the Internal Revenue Code invested in any of the Principal LifeTime Hybrid Collective Investment Funds at any time on or after April 14, 2020, excluding participants and beneficiaries in governmental plans, as defined by Section 414(d) of the Internal Revenue Code.

b. **IBEW District Number 9 Pension Plan Excessive Recordkeeping Fees Class**:     All participants and beneficiaries of the Plan at any time on or after April 14, 2020.

183.    Numerosity: The Classes are so numerous that joinder of all Class members is impracticable. During the relevant period, over 7,000 retirement plans had one or more participants invested in the Principal TDFs. Plaintiffs do not currently know the number of ERISA-covered retirement plan participants who invested in the Principal TDFs during the relevant period but believe it is in the hundreds of thousands.  During the relevant period, the Plan had tens of thousands of participants.

184.    Typicality:     Plaintiffs' claims are typical of the Class members' claims. Like other Class members, Plaintiffs invested in the Principal TDFs and paid recordkeeping fees to Defendants as concerns the Plan and suffered injuries as a result of the mismanagement of those TDFs and recordkeeping expenses by Defendants. Defendants managed the assets of each Principal TDF collectively, and all of the Principal TDFs had between 60 and 70 percent of their assets invested in the same Principal-affiliated large cap, mid cap, small cap and bond index funds discussed herein. Similarly, all of the Principal TDFs utilized underlying investment

PAGE 67 – CLASS ACTION ALLEGATION COMPLAINT

vehicles and share classes that were more expensive than identical versions of the same investments. Defendants' imprudent and disloyal decisions affected all Class members similarly.

185. Adequacy: Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are aligned with the Classes' that they seek to represent, and they have retained counsel experienced in complex class action litigation. Plaintiffs do not have any conflicts of interest with any Class members that would impair or impede their ability to represent such Class members.

186. Commonality: Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members, including but not limited to:

a. Whether Defendants are parties in interest under ERISA as concerns the Principal TDFs and the Plan's recordkeeping expenses;

b. Whether Defendants breached their ERISA duties by investing the assets of the Principal TDFs in Principal-affiliated large cap, mid cap, small cap and bond index funds;

c. Whether Defendants breached their ERISA duties by investing in mutual fund versions of actively managed Principal investments despite the availability of lower-cost but otherwise identical annuity separate account versions of those investments;

d. Whether Defendants breached their ERISA duties by failing to leverage the size and negotiating power of the Principal TDFs to procure the lowest-cost share class of each of the underlying investments of the Principal TDFs;

PAGE 68 – CLASS ACTION ALLEGATION COMPLAINT

e.      whether Defendants were fiduciaries to the Plan under ERISA;

f.      whether Defendants breached fiduciary duties to the Plan by failing to control its recordkeeping-related expenses in violation of ERISA;

g.      whether the Plan and Plan participants are entitled to damages or monetary relief as a result of Defendants' breaches of their ERISA duties;

h.      if so, the amount of damages or monetary relief that should be provided to the Plan and its participants;

i.      what Plan-wide equitable and other relief the Court should impose in light of Defendants' breaches; and

j.      whether the Plan and its participants are entitled to any other relief as a result of Defendants' breaches and conduct alleged herein.

187.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

188.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of equitable relief by the Court—such as removal of particular investments within the Principal TDFs or removal of any or all of the fiduciaries of the Principal TDFs—would be dispositive of non-party participants' interests. The accounting and restoration of participants' plan assets that

PAGE 69 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

214.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Classes. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

## CAUSES OF ACTION

## COUNT I

### ERISA PROHIBITED TRANSACTIONS WITH A PARTY IN INTEREST
**(Violation of § 406(a)(1) of ERISA, 29 U.S.C. § 1106(a)(1))**
**(On Behalf of TDF/ERISA Prohibited Transactions Nationwide Class)**

215.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

216.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a), prohibits ERISA fiduciaries from causing plans, such as the Plan here, to engage in certain transactions with parties in interest.

PAGE 70 – CLASS ACTION ALLEGATION COMPLAINT

217.    As alleged herein, Defendants pursuant to ERISA § 3(14), 29 U.S.C. § 1002(14), are fiduciaries and parties in interest under ERISA by dint of their roles, variously, as recordkeeper, trustee, administrator, service provider and investment manager to the Plan and its participants (including Plaintiffs) and also by reason of their roles as service provider, investment manager and trustee as to the TDFs and their possession and use of discretionary authority and control at all material times over the ERISA-covered plan assets of the TDFs—which TDFs, again, include the invested retirement savings of thousands of ERISA-subject retirement plans and plan participants nationwide.

218.    Under ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

219.    Under ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

220.    Under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

221.    Here, Defendant-fiduciaries caused the Plan to engage in numerous transactions with parties in interest to the Plan, in violation of ERISA § 406(a)(1)(C)–(D), 29 U.S.C. § 1106(a)(1)(C)–(D), including by using proprietary Principal investment options as the asset

PAGE 71 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

base of the TDFs and using Principal corporate affiliates who are Defendants here to administer, manage, and/or provide investment advice with regard to these investments, thereby generating unreasonable fees and other profits that benefited Defendants (who are all parties in interest here under ERISA) at the expense of Plaintiffs and the proposed classes.

222.    Defendants as alleged herein caused Plaintiffs and the Plan and the proposed classes to engage in transactions with parties in interest that were for more than reasonable compensation and/or were on terms less favorable than those offered to other shareholders.

223.    Defendant-fiduciaries caused the Plan and the proposed classes to engage in these prohibited transactions even though Defendants knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and ERISA-covered parties in interest and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest (viz, Defendants) of the assets of the Plan.

224.    As a direct and proximate result of Defendants' prohibited transaction violations, Plaintiffs and the Plan and the proposed classes directly or indirectly paid millions of dollars in declared and undeclared investment-related fees and revenues to Defendants, thereby resulting in millions of dollars in losses to the Plan and its participants and/or unjust profits for the benefit of the parties in interest.

225.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all unjust profits obtained in violation of 29 U.S.C. § 1106(a)(1) and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

PAGE 72 – CLASS ACTION ALLEGATION COMPLAINT

## COUNT II

**ERISA PROHIBITED TRANSACTIONS WITH A PARTY IN INTEREST**
**(Violation of § 406(a)(1) of ERISA, 29 U.S.C. § 1106(a)(1))**
**(On Behalf of IBEW District Number 9 Pension Plan Excessive Recordkeeping Fees Class)**

226.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

227.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a), prohibits ERISA fiduciaries from causing plans, such as the Plan here, to engage in certain transactions with parties in interest.

228.    As alleged herein, Defendants pursuant to ERISA § 3(14), 29 U.S.C. § 1002(14), are fiduciaries and parties in interest under ERISA by dint of their roles, variously, as recordkeeper, administrator, trustee, service provider and investment manager to the Plan and its participants (including Plaintiffs). Defendant Principal Life specifically is a party in interest in its role as recordkeeper to the Plan as described herein.

229.    Under ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect lending of money or other extension of credit between the plan and a party in interest.

230.    Under ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such transaction constitutes a direct or indirect furnishing of services between the plan and a party in interest.

231.    Under ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), a fiduciary shall not cause a plan to engage in a transaction, if the fiduciary knows or should know that such

PAGE 73 – CLASS ACTION ALLEGATION COMPLAINT

transaction constitutes a direct or indirect transfer to, or use by or for the benefit of, a party in interest of any assets of the plan.

232.    As described throughout this Complaint, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the administrative services and recordkeeping arrangements used by the Plan. Defendants imprudently and disloyally employed higher-cost recordkeeping and administrative services for the Plan despite the availability of functionally *identical,* yet less expensive recordkeeping and administrative services products offered by unaffiliated retirement plan services providers. Defendants did this to benefit themselves at the expense of Plaintiffs and the Plan.

233.    Defendants as alleged herein thus caused Plaintiffs and the Plan and the proposed classes to engage in transactions concerning the Plan's recordkeeping and administrative arrangements with parties in interest that were for more than reasonable compensation and/or were on terms less favorable than those offered to other shareholders.

234.    Defendant-fiduciaries caused the Plan and the proposed classes to engage in these prohibited transactions even though Defendants knew or should have known at all relevant times that such transactions constitute a direct or indirect furnishing of services between the Plan and ERISA-covered parties in interest and that such transactions constitute a direct or indirect transfer to, or use by or for the benefit of, the parties in interest of the assets of the Plan.

235.    As a direct and proximate result of Defendants' prohibited transaction violations, Plaintiffs and the Plan and the proposed classes directly or indirectly paid millions of dollars in recordkeeping-related fees and revenues to Defendants, thereby resulting in millions of dollars in losses to the Plan and its participants and/or unjust profits for the benefit of the parties in interest.

PAGE 74 – CLASS ACTION ALLEGATION COMPLAINT

236.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all unjust profits obtained in violation of 29 U.S.C. § 1106(a)(1) and shall be subject to such other equitable or remedial relief as the Court may deem appropriate.

## COUNT III

### Breach of ERISA Fiduciary Duties of Loyalty and Prudence
### (Violation of 29 U.S.C. § 1104(a)(1)(A)–(B), (D))
### (On Behalf of IBEW District Number 9 Pension Plan Excessive Recordkeeping Fees Class)

237.    Defendants are or were fiduciaries of the Plan as defined by 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

238.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their management of the Plan and its administrative and recordkeeping expenses.

239.    The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with the care, skill, diligence, and prudence required by ERISA. Defendants are directly responsible for prudently and loyally selecting appropriate recordkeeping and administrative services for the Plan and Plaintiffs and the proposed IBEW District Number 9 Pension Plan Excessive Recordkeeping Fees Class on an ongoing basis and taking all necessary steps to ensure that the Plan's assets are invested prudently and in a low-cost manner.

240.    As described throughout this Complaint, Defendants failed to employ a prudent and loyal process for selecting, monitoring, and reviewing the administrative services and recordkeeping arrangements used by the Plan. Defendants imprudently and disloyally employed higher-cost recordkeeping and administrative services for the Plan despite the availability of

PAGE 75 – CLASS ACTION ALLEGATION COMPLAINT

functionally *identical,* yet less expensive recordkeeping and administrative services products offered by unaffiliated retirement plan services providers. Defendants did this to benefit themselves at the expense of Plaintiffs and the Plan.

241.    Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Defendants, Principal Financial Group, Inc., and its affiliates. Through these actions and omissions, Defendants failed to discharge their fiduciary duties solely in the interest of participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

242.    Each of the above actions and omissions demonstrate that Defendants failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, thereby breaching their duties under 29 U.S.C. § 1104(a)(1)(B).

243.    Each Defendant is personally liable, and Defendants are jointly and severally liable, under 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), to make good the losses resulting from the aforementioned breaches, to restore any profits Defendants made through the use of ERISA plan assets, and to disgorge any profits earned as a result of the fiduciary breaches alleged in this Count.

244.    Each Defendant knowingly participated in the breach of one or more of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the

PAGE 76 – CLASS ACTION ALLEGATION COMPLAINT

circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually and as representatives of the classes defined herein, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants have committed prohibited transactions and breached their fiduciary duties under ERISA;

D.    An order compelling Defendants to personally make good all losses resulting from the breaches of their ERISA duties described above;

E.    An accounting for profits earned by Defendants and a subsequent order requiring Defendants to disgorge all profits earned from, or in respect of, Defendants' breaches of their ERISA duties related to the Principal TDFs during the relevant period;

F.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants including, but not limited to, imposition of a constructive trust on all ERISA plan assets transferred to Defendants as a result of Defendants' unlawful conduct in violation of ERISA or a surcharge against Defendants to prevent their unjust enrichment from unlawful transactions involving the assets of the Principal TDFs;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine;

PAGE 77 – CLASS ACTION ALLEGATION COMPLAINT

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 S.W. OAK STREET, SUITE 500
PORTLAND, OREGON 97204
TEL. (503) 227-1600   FAX (503) 227-6840

J.       An award of such other and further relief as the Court deems equitable and just.

DATED this 14th day of April, 2026.

STOLL STOLL BERNE LOKTING
 & SHLACHTER P.C.

By: s/Timothy S. DeJong
     **Timothy S. DeJong**, OSB No. 940662
     **Emily Johnson**, OSB No. 183791

209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:     (503) 227-1600
Email:         tdejong@stollberne.com
               ejohnson@stollberne.com

***Local Counsel for Plaintiffs***

**Steven A. Schwartz** (*pro hac vice* application forthcoming)
**Garrett Wotkyns** (*pro hac vice* application forthcoming)
CHIMICLES SCHWARTZ KRINER
& DONALDSON-SMITH
One Haverford Center
361 West Lancaster Avenue
Haverford, PA 19041
Telephone:     (610) 645-4712
Facsimile:     (610) 649-3633
Email:         steveschwartz@chimicles.com
               gww@chimicles.com

***Counsel for Plaintiffs***

PAGE 78 – CLASS ACTION ALLEGATION COMPLAINT